Peter C. Renn (Admitted *Pro Hac Vice*)
prenn@lambdalegal.org
Lambda Legal Defense and Education Fund, Inc.
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
Telephone:     (213) 382-7600
Facsimile:     (213) 351-6050

Kara N. Ingelhart (Admitted *Pro Hac Vice*)
kingelhart@lambdalegal.org
Lambda Legal Defense and Education Fund, Inc.
105 W. Adams St., 26th Fl.
Chicago, IL 60603
Telephone:     (312) 663-4413
Facsimile:     (312) 663-4307

Monica G. Cockerille (ISB No. 5532)
monicacockerille@me.com
Cockerille Law Office, PLLC
2291 N. 31st St.
Boise, ID 83703
Telephone:     (208) 343-7676
Facsimile:     (866) 226-2499

Attorneys for Plaintiffs F.V. and Dani Martin

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| F.V. and DANI MARTIN,<br><br>*Plaintiffs*,<br><br>v.<br><br>RUSSELL BARRON, in his official capacity as Director of the Idaho Department of Health and Welfare; ELKE SHAW-TULLOCH, in her official capacity as Administrator of the Division of Public Health for the Idaho Department of Health and Welfare; and JAMES AYDELOTTE, in his official capacity as State Registrar and Chief of the Bureau of Vital Records and Health Statistics,<br><br>*Defendants*. | No. 1:17-cv-00170-CWD<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION .......................................................................................................... 1

I.   FACTS .................................................................................................................... 2

     A.    Background Information Regarding Transgender People. ....................... 2

     B.    The Importance of Accurate Identity Documents for Transgender People. ............ 3

     C.    Defendants' Birth Certificate Policy ....................................................... 4

     D.    Plaintiffs F.V. and Dani Martin ............................................................. 6

II.  STANDARD .......................................................................................................... 7

III. ARGUMENT ......................................................................................................... 7

     A.    The Birth Certificate Policy Violates the Equal Protection Clause ........................ 7

          i.     The Birth Certificate Policy Triggers Strict Scrutiny Because It Discriminates on the Basis of a Suspect Classification ............................. 8

          ii.    The Birth Certificate Policy Triggers At Least Intermediate Scrutiny Because It Discriminates on the Basis of Sex ........................................... 10

          iii.   The Birth Certificate Policy Cannot Satisfy Any Level of Review, as Defendants Concede ............................................................................. 12

     B.    The Birth Certificate Policy Violates the Due Process Clause. ............................ 14

          i.     The Birth Certificate Policy Infringes Upon the Right to Informational Privacy .............................................................................. 14

          ii.    The Birth Certificate Policy Impermissibly Burdens the Right to Individual Liberty, Autonomy, and Dignity ............................................. 16

          iii.   As Under the Equal Protection Clause, No Rational Basis for the Policy Exists Under the Due Process Clause ....................................................... 18

     C.    The Birth Certificate Policy Impermissibly Compels Speech in Violation of the First Amendment .................................................................................. 18

CONCLUSION .......................................................................................................... 20

i

# TABLE OF AUTHORITIES

**CASES**

Page

*Adkins v. City of New York*,
143 F. Supp. 3d 134 (S.D.N.Y. 2015) ............................................................... 9, 10, 15

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
*133 S.* Ct. 2321 (2013) .......................................................................................... 18, 19

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................................... 7

*Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*,
208 F. Supp. 3d 850 (S.D. Ohio 2016) ....................................................................... 9

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ..................................................................................................... 8

*City of Los Angeles v. Patel*,
135 S. Ct. 2443 (2015) ................................................................................................. 8

*Doe ex rel. Doe v. Yunits*,
No. 001060A, 2000 WL 33162199 (Mass. Super. Oct. 11, 2000) ............................. 19

*Doe v. Brockton Sch. Comm.*, 2000-J-638,
2000 WL 33342399 (Mass. App. Ct. Nov. 30, 2000) ................................................ 19

*Evancho v. Pine-Richland Sch. Dist.*,
237 F. Supp. 3d 267 (W.D. Pa. 2017) .............................................................. 8, 9, 10

*Fabian v. Hosp. of Cent. Conn.*,
172 F. Supp. 3d 509 (D. Conn. 2016) ....................................................................... 11

*Frudden v. Pilling*,
742 F.3d 1199 (9th Cir. 2014) ................................................................................... 19

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) ................................................................................. 11

*Golinski v. Office of Pers. Mgmt.*,
  824 F. Supp. 2d 968 (N.D. Cal. 2012) ..................................................................... 9

*Hernandez-Montiel, v. INS*,
  225 F.3d 1084 (9th Cir. 2000)................................................................................. 10

*In re A.L.*,
  81 N.E.3d 283 (Ind. Ct. App. 2017)....................................................................... 16

*K.L. v. Alaska Dep't of Admin., Div. of Motor Vehicles*,
  No. 3AN-11-05431, 2012 WL 2685183 (Alaska Super. Ct. Mar. 12, 2012)..................... 13, 15

*Latta v. Otter*,
  19 F. Supp. 3d 1054 (D. Idaho 2014)......................................................... 8, 17, 20

*Latta v. Otter*,
  779 F.3d 902 (9th Cir. 2015)..................................................................................... 8

*Lawrence v. Texas*,
  539 U.S. 558 (2003) ............................................................................................... 18

*Love v. Johnson*,
  146 F. Supp. 3d 848 (E.D. Mich. 2015) ..................................................... 12, 13, 15

*Munoz v. Sullivan*,
  930 F.2d 1400 (9th Cir. 1991)................................................................................. 18

*Norsworthy v. Beard*,
  87 F. Supp. 3d 1104 (N.D. Cal. 2015) ......................................................... 9, 10, 11

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015) ..................................................................................... 17, 18

*Ostergren v. Cuccinelli*,
  615 F.3d 263 (4th Cir. 2010).................................................................................. 16

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992) ........................................................................................... 8, 17

*Powell v. Schriver*,
175 F.3d 107 (2d Cir. 1999) ................................................................................. 15

*Price Waterhouse v. Hopkins*,
490 U.S. 228 (1989) .............................................................................................. 11

*Roberts v. Clark Cty Sch. Dist.*,
215 F. Supp. 3d 1001 (D. Nev. 2016) .................................................................. 11

*Romer v. Evans*,
517 U.S. 620 (1996) .............................................................................................. 12

*Rumble v. Fairview Health Servs.*,
No. 14-cv-2037, 2015 WL 1197415 (D. Minn. Mar. 16, 2015) ........................... 11

*Schroer v. Billington*,
577 F. Supp. 2d 293 (D.D.C. 2008) ...................................................................... 11

*Schwenk v. Hartford*,
204 F.3d 1187 (9th Cir. 2000) ......................................................................... 10, 11

*SmithKline Beecham Corp. v. Abbott Labs.*,
740 F.3d 471 (9th Cir. 2014) ................................................................................ 10

*Tucson Woman's Clinic v. Eden*,
379 F.3d 531 (9th Cir. 2004) ........................................................................... 14, 15

*United States v. Virginia*,
518 U.S. 515 (1996) .............................................................................................. 10

*United States v. Windsor*,
133 S. Ct. 2675 (2013). ..................................................................................... 9, 18

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) .............................................................................................. 19

*Whalen v. Roe*,
429 U.S. 589 (1977) .............................................................................................. 14

*Whitaker v. Kenosha Unified Sch. Dist.*,
   858 F.3d 1034 (7th Cir. 2017).............................................................................. 9, 11

*Windsor v. United States*,
   699 F.3d 169 (2d Cir. 2012).................................................................................... 9

*Wooley v. Maynard*,
   430 U.S. 705 (1977).......................................................................................... 18, 19

## STATUTES

Idaho Code §§ 39-240 to 39-278 ................................................................................. 5
Idaho Code §§ 39-250............................................................................................. 5, 16
Idaho Code §§ 39-258........................................................................................... 16, 17

## RULES AND REGULATIONS

Fed. R. Civ. P. 56(c) .................................................................................................. 7
Idaho Admin. Code r. 16.02.08.201........................................................................... 5

## OTHER AUTHORITIES

Lisa Mottet, *Modernizing State Vital Statistics Statutes and Policies to Ensure Accurate Gender Markers on Birth Certificates: A Good Government Approach to Recognizing the Lives of Transgender People*, 19 Mich. J. Gender & L. 373 (2013) .................................................... 13

# INTRODUCTION

This action is brought by transgender people who seek to correct their Idaho birth certificates to accurately reflect their sex, as determined by their gender identity.  The government has conceded in this litigation that it lacks even a rational basis for refusing to provide such birth certificates.  On that basis alone, Plaintiffs are entitled to summary judgment.

Accurate identity documents are essential to one's ability to navigate through life.  A birth certificate is a trusted and ubiquitous identity document used for wide array of purposes, from the mundane to the indispensable.  Access to employment, education, housing, health care, banking, travel, and government services often depend on having documentation that accurately reflects an individual's identity.

While others born in Idaho have access to an accurate birth certificate matching their gender identity—a fundamental component of human identity that everyone possesses— transgender people alone are barred from obtaining an accurate birth certificate matching their gender identity.  Idaho's refusal to issue such birth certificates erects a barrier to the full recognition, participation, and inclusion of transgender people in society.  The mismatch between one's gender identity and birth certificate can also disclose the fact that a person is transgender, unnecessarily exposing that person to discrimination, invasions of privacy, and even violence.  The same is true for Idaho's policy with respect to name changes:  although Idaho permits transgender people to update their birth certificate following a name change, it insists on also including their birth names, which can similarly reveal a person's transgender status.

Idaho's policy of refusing to allow the correction of gender markers on the birth certificates of transgender people makes it an outlier from nearly all other jurisdictions across the country, which have established processes by which transgender people can do so.  It also is

1

inconsistent with Idaho's own policy of permitting transgender people to correct the gender markers on their driver's licenses to match their gender identity.

Idaho's birth certificate policy violates federal constitutional guarantees, including the rights to equal protection, due process, and freedom from compelled speech. A ruling on any one of these claims warrants granting summary judgment to Plaintiffs.

## I. FACTS

### A. Background Information Regarding Transgender People

Gender identity is a person's internal sense of belonging to a particular sex. Pls.' Statement of Material Facts ("SOF") ¶ 1. It is a deeply felt and core component of human identity that everyone possesses. *Id.* Although the majority of people possess a gender identity that matches their sex assigned at birth, that is not the case for transgender people, who are defined as transgender because their gender identity does not match their sex assigned at birth. *Id.* ¶ 3. An individual's sex is generally assigned at birth based on their external genitalia. *Id.* ¶ 4. However, other sex-related characteristics can include chromosomes, hormone levels, internal reproductive organs, and, of particular relevance here, gender identity. *Id.*

Where an individual's sex-related characteristics are not in typical alignment with each other, gender identity is the critical determinant of sex. *Id.* ¶ 5. Attempts to change an individual's gender identity in order to bring it into alignment with the individual's birth-assigned sex are not only ineffective but, as Defendants concede, can have negative effects. *Id.* ¶ 5. This includes extreme psychological harm. *Id.* All major associations of medical and mental health providers consider attempts to change an individual's gender identity to be unethical. *Id.*

The discordance between one's gender identity and birth-assigned sex can be associated with clinically significant distress, which is known as gender dysphoria. *Id.* ¶ 6. Gender

2

dysphoria is a serious medical condition that, if inadequately treated, can have serious health consequences. *Id.*

Gender transition is the process by which transgender individuals bring their appearance and lived experience into alignment with their gender identity, and it can be critical to treatment for gender dysphoria. *Id.* ¶ 7. Transition can involve both social and medical steps, such as hormone therapy or surgical treatment, although the precise needs for any particular person are individualized. *Id.* Living in a manner consistent with one's gender identity, also known as social transition, is essential to the health and well-being of transgender people. *Id.* ¶ 8. For a transgender woman, for example, social transition can include changing her first name to one commonly used by women, correcting identity documents to reflect her female gender, wearing typical female attire, and using female pronouns. Gender transition does not *change* a transgender person's sex; rather, it brings that person's appearance and lived experience into greater alignment with their existing gender identity, which determines their sex. *Id.* ¶ 7.

**B.   The Importance of Accurate Identity Documents for Transgender People**

A birth certificate is more than a piece of paper. *Id.* ¶ 9. It reflects government recognition of one's gender—just as a marriage certificate reflects government recognition of one's relationship. A birth certificate is an essential government-issued document that people use to prove their identity and the range of information the certificate conveys. *Id.* ¶ 10. Birth certificates are used in a wide variety of contexts, including to obtain other identity documents (such as driver's licenses, social security cards, passports, and other state and federal identification documents), to prove age, and to satisfy other identity requirements. *Id.* ¶ 11.

Saddling transgender people with identity documents discordant with their gender identity creates myriad practical, social, and psychological consequences. First, all people need

3

access to accurate identity documents that they can use to prove their identity.  For transgender people, however, the gender marker on their birth certificate can undermine that purpose.  A woman born in Idaho who is transgender, for example, has a birth certificate designating her as male; that gender marker can visibly conflict with her gender identity and thereby arouse suspicion as to whether she is the same person reflected on her birth certificate.  *Id.* ¶ 12.

Second, transgender people who use a birth certificate with information reflecting their birth-assigned sex risk disclosure of their transgender status, which is personal information that they may not wish to disclose for fear of retaliation.  *Id.* ¶ 13.  According to the 2015 U.S. Transgender Survey, nearly one in three transgender respondents who showed an identity document with a name or gender that did not match their perceived gender were verbally harassed, denied benefits or service, asked to leave, or assaulted.  *Id.* ¶ 14.

Third, depriving transgender people of access to identity documents that accurately reflect their gender identity can cause psychological harm and exacerbate gender dysphoria.  *Id.* ¶ 15.  Inaccurate identity documents can cause a transgender individual to isolate, in order to avoid situations risking discrimination, ridicule, accusations of fraud, or even violence.  *Id.* Being stripped of one's dignity, privacy, and the ability to move about freely in society can cause negative health consequences.  *Id.*

### C.    Defendants' Birth Certificate Policy

Defendants Russell Barron, Elke Shaw Tulloch, and James Aydelotte (collectively, "Defendants") are state officials within the Idaho Department of Health and Welfare ("IDHW") who exercise responsibility for issuing and changing Idaho birth certificates.  *Id.* ¶¶ 17-19.  They enforce a policy and practice that categorically refuses to correct the gender marker on transgender people's birth certificates to match their gender identity (the "Birth Certificate

Policy"). *Id.* ¶ 20.  The Birth Certificate Policy challenged here also includes a refusal to provide a birth certificate matching a transgender person's gender identity without the inclusion of information that can disclose one's transgender status—namely, the display of one's birth name in addition to one's legal name following a name change.[1]

There is no statute requiring the Birth Certificate Policy.  *See generally* Idaho Vital Statistics Act, Idaho Code §§ 39-240 to 39-278.  To the contrary, the Idaho Vital Statistics Act provides that any certificate may be changed pursuant to promulgated rules.  Idaho Code § 39-250.  IDHW has exercised that authority to permit changes to birth certificates not specified by statute, such as to correct obvious errors, fix transposition of letters, and make "other amendments" based upon the objectives of the vital statistics statutes and the best interests of the public.  Idaho Admin. Code r. 16.02.08.201.  IDHW has not, however, exercised that authority to change the Birth Certificate Policy.

In contrast to its approach with respect to birth certificates, Idaho permits a transgender person to correct the sex indicated on his or her driver's license.  SOF ¶ 23.

Critically, Defendants admit that they "are aware of no rational basis justifying a prohibition against changing the sex designation on the birth certificate of a transgender person who has undergone clinically appropriate treatment to permanently change his or her sex."  *Id.* ¶ 21.  Defendants also have not identified any justification for requiring the inclusion of information on a birth certificate that could disclose a person's transgender status, whether through one's birth-assigned sex or birth name.

---

[1] A sample birth certificate displaying both a person's birth name and legal name following a name change is provided.  Declaration of Monica Cockerille, Ex. B (birth certificate of a transgender woman disclosing a name change from "John" to "Emilie").

5

### D.    Plaintiffs F.V. and Dani Martin

Plaintiff F.V. is a 28-year-old woman who was born in Boise, Idaho and currently resides in Hawaiʻi.  *Id.* ¶ 24.  Her gender identity and expression is female, but she was assigned the sex of male at birth.  *Id.* ¶ 25.  F.V. began living openly as female when she was approximately 15 years old, and she has lived openly as a woman since that time.  *Id.* ¶ 26.

Like other transgender people, F.V. has personally encountered violence on the basis of her transgender status, as well as hostility when presenting identity documents disclosing her transgender status.  *Id.* ¶¶ 27-28.  For example, when visiting a social security office, she presented her birth certificate identifying her as "male," which prompted a staff member to exclaim, "wow, you're a tranny."  *Id.* ¶ 29.  Others in the waiting area heard this remark, and a man hurled an epithet at F.V., referring to her as a "faggot," when she was leaving the office.  *Id.* ¶ 30.  F.V. also experienced hostility that caused her to fear for her personal safety when using other identity documents in the past that were discordant with her gender identity.  *Id.* ¶ 31 (recounting experiences involving sexual harassment or the gratuitous disclosure of her transgender status to third parties).  Although she has been able to correct her gender marker on other identity documents, she remains unable to do so for her birth certificate.  *Id.* ¶ 34.

Plaintiff Dani Martin is a 31-year-old woman who was born at Mountain Home Air Force Base in Idaho and raised in Mountain Home.  She currently resides in Meridian with her wife and children.  *Id.* ¶ 35.  She works as a food service correctional officer for the State of Idaho, which is a role that she has served for the last eight years, and she currently works at a facility that helps those nearing release prepare to re-enter society.  *Id.* ¶ 36.  Ms. Martin's gender identity and expression is female, but she was assigned the sex of male at birth.  *Id.* ¶ 37.  She came out as transgender in 2014 and she began living openly as a woman at that time.  *Id.* ¶ 38.

Like F.V., Ms. Martin has endured harassment on the basis of her transgender status that has caused her to fear for her personal safety.  *Id.* ¶ 39.

Ms. Martin has also experienced harms from being deprived of a birth certificate matching her gender identity.  For example, when she went to the Idaho Department of Motor Vehicles to correct the gender marker on her driver's license, the clerk wrongly insisted that she would need to present her birth certificate for inspection, and a supervisor had to intervene to resolve the dispute.  *Id.* ¶ 40.  It was humiliating for Ms. Martin to have to defend that she was a woman and entitled to be treated as such against a government official's insistence to the contrary, simply because she did not have a birth certificate reflecting that she was female.  *Id.*  Without the security that an accurate birth certificate provides, Ms. Martin remains vulnerable to indignities like this experience and to discriminatory treatment by third parties challenging that she is a woman.

## II.     STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact and [] the moving party is entitled to judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *see also* Fed. R. Civ. P. 56(c).

## III.    ARGUMENT

### A.     The Birth Certificate Policy Violates the Equal Protection Clause.

The Birth Certificate Policy violates Plaintiffs' right to equal protection under the law.  It discriminates on the basis of a suspect classification, thus triggering strict scrutiny, by harming a minority group whose members have suffered a history of irrational discrimination.  At a minimum, the Birth Certificate Policy discriminates on the basis of sex and thus requires

7

intermediate scrutiny.  Regardless of the standard of review applied, however, the Birth

Certificate Policy lacks even a rational basis, as Defendants concede.

**i.     The Birth Certificate Policy Triggers Strict Scrutiny Because It
Discriminates on the Basis of a Suspect Classification.**

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that

all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*,

473 U.S. 432, 439 (1985).  Certain government classifications are presumptively unconstitutional

because they are particularly likely to reflect unjustified discrimination borne of historical

animus.  *Latta v. Otter*, 19 F. Supp. 3d 1054, 1073 (D. Idaho 2014), *aff'd*, 779 F.3d 902 (9th Cir.

2015).  These classifications must survive strict scrutiny, which requires the government to show

that the classification is narrowly tailored to a compelling governmental interest.  *Id.*

The Birth Certificate Policy employs a suspect classification by denying transgender

people—and them alone—a birth certificate matching their gender identity.  For example, Idaho

only permits non-transgender women to have birth certificates reflecting their female gender

identity.  That necessarily excludes transgender women, even though their gender identity is also

female.  Plaintiffs "are being distinguished . . . from those whose gender identities are congruent

with their assigned sex."  *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 285 (W.D.

Pa. 2017).  That is, by definition, differential treatment "on the basis of their transgender status."[2]

*Id.*

---

[2] As the Supreme Court has explained, "[t]he proper focus of the constitutional inquiry is the
group for whom the law is a restriction."  *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451
(2015) (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 837-38 (1992)).  That is
also why laws that barred marriage to a person of the same sex, for example, "clearly
discriminate[d] on the basis of sexual orientation."  *Latta*, 19 F. Supp. 3d at 1074.  The
availability of marriage to a person of a different sex was "no answer" for lesbian and gay
people, who could not "switch off their sexual orientation and choose to be content with the
universe of opposite-sex partners approved by the State."  *Id.* at 1072.  The same is true for
transgender people, who similarly cannot "switch off" their gender identity.  SOF ¶¶ 2, 5.

8

Strict scrutiny is warranted where the government discriminates against a class that (1) has been "historically subjected to discrimination," (2) has a defining characteristic bearing no "relation to ability to perform or contribute to society," (3) has "obvious, immutable, or distinguishing characteristics," and (4) is "a minority or politically powerless." *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (internal quotation marks omitted). The first two factors alone can be dispositive, and "[t]he presence of any of the factors is a signal" that the government classification at issue does not serve a legitimate objective. *Golinski v. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 983 (N.D. Cal. 2012).

Applying these criteria, courts have recognized that "discrimination based on transgender status independently qualifies as a suspect classification." *See Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *see also Evancho*, 237 F. Supp. 3d at 288; *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015). As Defendants agree, "[t]ransgender people have suffered a long history of extreme discrimination and continue to suffer such discrimination to this day." SOF ¶ 14. "There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity." *Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *see also Adkins*, 143 F. Supp. 3d at 139; *Evancho*, 237 F. Supp. 3d at 288.

Moreover, as Defendants also agree, this longstanding discrimination is unrelated to the ability of transgender people to contribute to society. SOF ¶ 14; *see Adkins*, 143 F. Supp. 3d at 139 ("The Court is not aware of any data or argument suggesting that a transgender person, simply by virtue of transgender status, is any less productive than any other member of society."). For these reasons alone—a history of discrimination and the lack of any relation to

9

ability—discrimination against transgender people must be subjected to strict scrutiny.

The remaining two considerations militating in favor of strict judicial scrutiny are present here as well.  Not only is gender identity an immutable and distinguishing characteristic, but transgender people are also politically vulnerable minority.  SOF ¶¶ 2, 5; *see also Hernandez-Montiel*, *v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) ("[s]exual orientation and sexual identity are immutable; they are so fundamental to one's identity that a person should not be required to abandon them"); *Norsworthy*, 87 F. Supp. 3d at 1119 n.8 (gender identity "equally immutable" as sexual orientation); *Adkins*, 143 F. Supp. 3d at 140 ("[T]ransgender people lack the political strength to protect themselves."); *Evancho*, 237 F. Supp. 3d at 288.

In sum, because discrimination against transgender people rings each and every alarm bell alerting courts to a suspect classification, the Birth Certificate Policy is subject to strict scrutiny.  The Ninth Circuit has already confirmed that government discrimination based on sexual orientation requires heightened scrutiny.  *SmithKline Beecham Corp. v. Abbott Labs.,* 740 F.3d 471, 481-84 (9th Cir. 2014).  The logic of that holding "applies with at least equal force to discrimination against transgender people, whose identity is equally immutable and irrelevant to their ability to contribute to society, and who have experienced even greater levels of societal discrimination and marginalization."  *Norsworthy*, 87 F. Supp. 3d at 1119 n.8.

### ii.  The Birth Certificate Policy Triggers At Least Intermediate Scrutiny Because It Discriminates on the Basis of Sex.

Independently, discrimination against transgender people is also a form of sex-based discrimination that must, at the very least, be supported by an "exceedingly persuasive justification" under intermediate scrutiny.  *See United States v. Virginia*, 518 U.S. 515, 531 (1996); *Schwenk v. Hartford*, 204 F.3d 1187, 1200-02 (9th Cir. 2000) (holding that an attack motivated by transgender status was "committed because of gender").

Discrimination against transgender people discriminates based on sex.  First, an individual's transgender status inherently turns on "sex-based considerations." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989).  An individual is defined as transgender because of the discordance between two sex-based considerations:  gender identity and birth-assigned sex.  A robust body of case law has recognized that discrimination because of gender identity is necessarily discrimination because of sex.[3]  *See, e.g.*, *Schwenk*, 204 F.3d at 1201-02 (holding that conduct motivated by an individual's "gender or sexual identity" is because of "gender," which is interchangeable with "sex"); *Roberts v. Clark Cty Sch. Dist.*, 215 F. Supp. 3d 1001, 1011 (D. Nev. 2016); *Fabian*, 172 F. Supp. 3d at 526-27; *Norsworthy*, 87 F. Supp. 3d at 1119; *Rumble v. Fairview Health Servs.*, No. 14-cv-2037, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015).  Here, in particular, the sex that the government lists on a person's birth certificate is literally a government classification of that person's sex, and the way in which Idaho classifies the sex of transgender people on their birth certificates causes them harm.

Second, discrimination against transgender people penalizes them for their perceived nonconformity to sex stereotypes.  As the Ninth Circuit has explained, by definition, a transgender person's "inward identity [does] not meet social definitions of masculinity [or femininity]" associated with one's birth-assigned sex.  *Schwenk*, 204 F.3d at 1201.  In that sense, "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes." *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011); *see also Whitaker*, 858 F.3d at 1049 (collecting cases).

---

[3] Discrimination against a transgender individual also constitutes sex discrimination in the same way that firing an employee because she converts from Christianity to Judaism "would be a clear case of discrimination 'because of religion,'" and "[n]o court would take seriously the notion that 'converts' are not covered."  *Schroer v. Billington*, 577 F. Supp. 2d 293, 306 (D.D.C. 2008); *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 526 (D. Conn. 2016).

11

### iii.   The Birth Certificate Policy Cannot Satisfy Any Level of Review, as Defendants Concede.

The Birth Certificate Policy cannot survive any level of scrutiny, much less the exacting inquiry required by heightened scrutiny.  "[E]ven in the ordinary equal protection case calling for the most deferential of standards, [courts] insist on knowing the relation between the classification adopted and the object to be obtained."  *Romer v. Evans*, 517 U.S. 620, 632 (1996).

Here, there is no rational basis for depriving transgender people like Plaintiffs of birth certificates that match their gender identity, without the inclusion of information that discloses their transgender status.  Defendants concede that they "are aware no rational basis" for categorically refusing to correct gender markers on the birth certificates of transgender people. SOF ¶ 21.  That is sufficient to end the matter.

The undisputed facts here also confirm and illustrate the absence of any rational basis for the Birth Certificate Policy.  For transgender people born in Idaho, the Birth Certificate Policy does not further—and in fact undermines—any conceivable goal of aiding the verification of one's identity.  SOF ¶ 12.  A conflict between one's gender identity and one's birth certificate casts doubt upon whether one is the same person reflected on the birth certificate.  *Id.*

Courts in Michigan and Alaska have recognized that the refusal to correct the gender markers of transgender people on identity documents fails to serve a legitimate government interest.  In Michigan, the court held that the state's refusal to correct the gender markers on the driver's licenses of transgender plaintiffs "[bore] little, if any, connection to Defendant's purported interests" in maintaining accurate identity documents.  *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015).  In Alaska, the court held that a similar refusal to correct the gender marker on the driver's license of a transgender woman not only lacked "a close and substantial relationship to the furtherance of the state's interest in accurate document and

12

identification" but, in fact, created a risk of "inaccurate and inconsistent identification documents."  *K.L. v. Alaska Dep't of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431, 2012 WL 2685183, at *7 (Alaska Super. Ct. Mar. 12, 2012).  Just as a license bearing a transgender person's birth-assigned sex can "inaccurately describe the discernable appearance of the license holder by not reflecting the holder's lived gender expression of identity," *id.,* and thereby cast doubt on whether the person at issue is the same the person reflected on the license, the same is true for birth certificates.

Furthermore, the Birth Certificate Policy creates inconsistencies with other identity documents that *do* accurately reflect a transgender person's gender identity, such as a driver's license or a passport, further undermining any government interest in identity verification.  *See id.* (noting the "discrepancies and inaccuracies between Alaska driver's licenses [and] other forms of government issued identification").  No government interest is served by this patchwork of identity documents, with only some accurately conveying a person's identity.

Indeed, the fact that forty-six states and the District of Columbia all have processes by which transgender people can correct the gender markers on their birth certificates confirms the absence of any government justification adequate to sustain Idaho's Birth Certificate Policy.[4] *See Love*, 146 F. Supp. 3d at 857 (finding that Michigan's driver's license policy was not adequately tailored to purported state interests where numerous other states did not impose similar obstacles to correcting the gender markers on their driver's licenses).  Idaho's own policy of permitting transgender people to correct the gender markers on their Idaho driver's licenses

---

[4] *See generally* National Center for Transgender Equality, *ID Documents Center*, available at https://www.transequality.org/documents (providing comprehensive state-by-state information); *see also* Lisa Mottet, *Modernizing State Vital Statistics Statutes and Policies to Ensure Accurate Gender Markers on Birth Certificates: A Good Government Approach to Recognizing the Lives of Transgender People*, 19 Mich. J. Gender & L. 373, 381 (2013).

reinforces that conclusion.

In sum, if a transgender person seeks to correct the gender marker on his or her Idaho birth certificate in order to accurately reflect his or her gender identity, then there is no rational basis for the government's refusal to provide such a birth certificate.  Defendants appear to add a caveat—that such a person would need to undertake "clinically appropriate treatment" to correct their birth certificate, SOF ¶ 21—but that is already inherent in the nature of the request: correcting identity documents to match one's gender identity is sought as part of gender transition, the entire purpose of which is to serve one's health and well-being.  *Id.* ¶ 8. Defendants also seem to imply that a transgender person should demonstrate to the satisfaction of a government official that he or she has "permanently change[d] his or her sex."  *Id.* ¶ 21 Given that gender identity is an immutable characteristic, *id.* ¶ 5, this additional requirement is wholly gratuitous.  It also risks inviting an inquiry of what constitutes a sufficiently "permanent" transition in the eyes of government.  That inquiry is rife for mischief and, more importantly, the permanence of any particular step taken to transition has no bearing on the legitimacy of a transgender person's need for a birth certificate matching his or her gender identity.  *Id.* ¶ 16.

**B.    The Birth Certificate Policy Violates the Due Process Clause.**

**i.    The Birth Certificate Policy Infringes Upon the Right to Informational Privacy.**

The Supreme Court has recognized a constitutionally protected zone of privacy sheltered by the Fourteenth Amendment's Due Process Clause.  *See Whalen v. Roe*, 429 U.S. 589, 598 n.23 (1977).  This zone of privacy protects against "disclosure of personal matters." *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004) (internal quotation mark omitted). Some of the considerations relevant to whether the government has encroached upon a person's right to privacy include the type of information at issue; the potential for harm in disclosure; the

14

adequacy of safeguards to prevent disclosure; the degree of need for access; and whether public policy militates towards access. *Id.*

The government violates a person's right to keep his or her transgender status private when it deprives that person of identity documents consistent with his or her gender identity. *See Love*, 146 F. Supp. 3d at 856 ("[R]equiring Plaintiffs to disclose their transgender status . . . directly implicates their fundamental right of privacy."); *K.L.*, 2012 WL 2685183, at *6 (holding that the refusal to correct the gender marker on the driver's license of a transgender woman violated her right to privacy). One's transgender status is deeply private and sensitive information. *See Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999) ("The excruciatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate."). The Birth Certificate Policy causes the disclosure of such information by the display of a gender marker discordant with one's gender identity and by the inclusion of one's birth name even after a name change, both of which act as red flags that the birth certificate holder is transgender. SOF ¶ 22.

The disclosure of one's transgender status, particularly in circumstances where one would otherwise keep that information private, can provoke intense "hostility and intolerance from others." *Powell*, 175 F.3d at 111. "A mismatch between the gender indicated on the document and the gender of the holder calls down discrimination." *Adkins*, 143 F. Supp. 3d at 139-40. There remains "a great deal of animosity" towards transgender people, as confirmed by a "plethora" of evidence—including disturbing hate crimes statistics. *Love*, 146 F. Supp. 3d at 855-56. Plaintiffs' own life experiences confirm that these threats are all too real. *See, e.g.*, SOF ¶¶ 27, 39. Moreover, after one's transgender status is disclosed to a third party through an identity document discordant with one's gender identity, there are no safeguards to prevent that

15

third party from disclosing that information to others.  *See, e.g.*, SOF ¶¶ 30, 32-33 (describing experiences where third parties further disclosed F.V.'s transgender status to others).  The Birth Certificate Policy thus not only reveals private information, but it also deprives a person of control over the circumstances in which personal matters are disseminated, which is an essential aspect of privacy.  *See Ostergren v. Cuccinelli*, 615 F.3d 263, 283 (4th Cir. 2010).

Defendants admit that "they are aware of no legitimate government interest in forcing a person's disclosure of transgender status."  SOF ¶ 22.  There is accordingly no public policy or need served by the unwanted disclosure of one's transgender status.  And there are simple ways to prevent that unwanted disclosure here.  In addition to allowing transgender people to correct the gender markers on their birth certificates to match their gender identity, Idaho can also easily issue copies of birth certificates without displaying their birth names—as it already does for others in contexts where privacy interests are implicated.  *See, e.g.*, Idaho Code § 39-250(2)-(3) (permitting birth certificates that change a child's name after an acknowledgement of paternity without requiring display of child's former name); Idaho Code § 39-258(a) (same for adoption); *cf. In re A.L.*, 81 N.E.3d 283, 289-91 (Ind. Ct. App. 2017) (holding that transgender petitioner was entitled to waive the publication requirement ordinarily required for a name change because of the risk of harm from disclosing one's transgender status).  There is no justification for the privacy violations that the Birth Certificate Policy gratuitously inflicts.

### ii.    The Birth Certificate Policy Impermissibly Burdens the Right to Individual Liberty, Autonomy, and Dignity.

The Birth Certificate Policy also tramples over Plaintiffs' substantive due process rights.  "[T]he liberty guaranteed by the Fourteenth Amendment extends beyond the Bill of Rights to 'the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life.  Beliefs about these matters could not define the attributes of personhood

16

were they formed under the compulsion of the State.'" *Latta*, 19 F. Supp. 3d at 1068 (*quoting Casey*, 505 U.S. at 851).

Few decisions are as deeply personal and important as the decision by transgender people to live in a manner consistent with their gender identity.  For F.V., for example, living openly as a woman has sometimes come at great personal cost—but it has also allowed her to live an authentic life, which she cherishes.  SOF ¶ 26.  The right to liberty secured by the Constitution safeguards that exercise of individual autonomy.  "The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons . . . to define and express their identity." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593 (2015).  Constitutionally protected liberty interests are those that implicate "individual dignity and autonomy"—i.e., decisions or actions that "shape an individual's destiny." *Id.* at 2597, 2599.  A person's core internal sense of their own gender, and what that means for their everyday life, is profoundly central to their personal identity in ways the Constitution protects.

Transgender people possess this liberty in equal measure with all others.  As the Supreme Court has cautioned, "rights" cannot be "defined by who exercised them in the past"; otherwise, "new groups could not invoke rights once denied." *Id.* at 2602.  Our founders "did not presume to know the extent of freedom in all its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning." *Id.* at 2598.

A woman's liberty interest to live as a woman is severely burdened where the government insists on treating her as a man, rather than a woman.  Just as requiring a non-transgender woman to identify herself as a man on government-issued identity documents would intrude upon individual liberty, the Birth Certificate Policy intrudes upon Plaintiffs' right to live as the gender that they are.  The Due Process Clause protects self-expression as an "intimate

17

choice[] that define[s] personal identity and beliefs." *Id.* at 2597.  In *Lawrence v. Texas*, 539 U.S. 558 (2003), the Supreme Court held that states could not criminalize intimate same-sex conduct; ten years later in *United States v. Windsor*, 133 S. Ct. at 2689, it recognized that the government's refusal to extend legal recognition to the marriages of same-sex couples was a deprivation of liberty, because it restricted those individuals' ability to "define themselves by their commitment to each other."  Here, as well, Plaintiffs' "only real path" to full recognition of their personhood is through full recognition of their gender.  *Obergefell*, 135 S. Ct. at 2594.

### iii. As Under the Equal Protection Clause, No Rational Basis for the Policy Exists Under the Due Process Clause.

Defendants' concession that the Birth Certificate Policy lacks a rational basis under the Equal Protection Clause also compels the same conclusion under the Due Process Clause as a matter of law.  *See Munoz v. Sullivan*, 930 F.2d 1400, 1404 (9th Cir. 1991) (holding that "the rational basis test is identical under the two rubrics" for equal protection and due process). Accordingly, all the reasons for why the Birth Certificate Policy violates the Equal Protection Clause*, supra* Section III(A)(iii), also doom its constitutionality under the Due Process Clause.

### C. The Birth Certificate Policy Impermissibly Compels Speech in Violation of the First Amendment.

The Birth Certificate Policy violates Plaintiffs' First Amendment rights by impermissibly compelling speech:  whenever F.V. and Ms. Martin use their birth certificates, they must falsely identify themselves as "male" and also reveal private information about their transgender status.

The First Amendment protects not only the right to speak but also "the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  The Supreme Court has consistently "prohibit[ed] the government from telling people what they must say."  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2327 (2013) (internal quotation marks omitted).  For example, the government may not require license plates with the state motto

18

"Live Free or Die," *Wooley*, 430 U.S. at 707, require students to salute the American flag, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), or require students to wear uniforms with the motto, "Tomorrow's Leaders," *Frudden v. Pilling*, 742 F.3d 1199 (9th Cir. 2014), without satisfying the strictures of strict scrutiny.  This protection against compelled speech is not limited to speech that sends an ideological message.  *Frudden*, 742 F.3d at 1206.

The Birth Certificate Policy invades a transgender person's right not to disseminate an inaccurate message with which they fundamentally disagree—that they are male or female, when that does not match their gender identity.  People present identity documents to answer a fundamental question:  "Who are you?"  Yet the government here foreordains how Plaintiffs must answer that question—with a response that is false and discordant with their identity.  "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Agency for Int'l Dev.*, 133 S. Ct. at 2327 (internal quotation marks omitted).

Just as courts have recognized that the expression of one's gender identity is entitled to First Amendment protection, compelling expression contrary to one's gender identity also runs afoul of the First Amendment.  *Cf. Doe ex rel. Doe v. Yunits*, No. 001060A, 2000 WL 33162199, *3 (Mass. Super. Oct. 11, 2000) (holding that a school likely violated transgender girl's right to freedom of expression by prohibiting her from wearing typical girls' clothing and otherwise expressing her female gender identity), *aff'd sub nom*, *Doe v. Brockton Sch. Comm.*, 2000-J-638, 2000 WL 33342399 (Mass. App. Ct. Nov. 30, 2000).

It makes no constitutional difference whether Plaintiffs may resort to "alternative means to disclaim" the speech compelled by their birth certificates, such as by explaining that they are women who are transgender.  *See Frudden*, 742 F.3d at 1205-06.  Indeed, such speech would

19

come at the price of disclosing their transgender status—which itself is speech that they have a right to keep private against coerced disclosure. And, as a practical matter, the government's message that Plaintiffs are "male" substantially frustrates Plaintiffs' ability to communicate the message they are female. For example, Ms. Martin encountered significance resistance from a Department of Motor Vehicle clerk who did not believe that Ms. Martin was entitled to a driver's license with a female gender marker (even though that refusal was contrary to state policy), given that she could not produce a birth certificate reflecting that she was female. SOF ¶ 40.

Because the Birth Certificate Policy impermissibly compels speech, it is subject to strict scrutiny under the First Amendment, but as noted above, it fails even rational basis review.

## CONCLUSION

As this Court has previously recognized, "[i]t is precisely because the issue raised by this case touches the heart of what makes individuals what they are that we should be especially sensitive to the rights of those whose choices upset the majority." *Latta*, 19 F. Supp. 3d at 1059 (internal quotation marks omitted). Plaintiffs respectfully request that this Court grant their motion in full and issue (i) declaratory relief holding the Birth Certificate Policy unconstitutional and (ii) injunctive relief enjoining Defendants and others subject to the injunction from enforcing the Birth Certificate Policy, including by refusing to provide birth certificates to transgender people that accurately reflect their sex, consistent with their gender identity, without the inclusion of information that would disclose their transgender status.

DATED: September 29, 2017      By:   /s/ Monica G. Cockerille

                                  Monica G. Cockerille (ISB No. 5532)
                                  monicacockerille@me.com
                                  Cockerille Law Office, PLLC
                                  2291 N. 31st St.
                                  Boise, ID 83703
                                  Telephone:   (208) 343-7676
                                  Facsimile:   (866) 226-2499

Peter C. Renn*
prenn@lambdalegal.org
Lambda Legal Defense and Education Fund, Inc.
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
Telephone:     (213) 382-7600
Facsimile:     (213) 351-6050

Kara Ingelhart*
kingelhart@lambdalegal.org
Lambda Legal Defense and Education Fund, Inc.
105 W. Adams St., 26th Fl.
Chicago, IL 60603
Telephone:     (312) 663-4413
Facsimile:     (312) 663-4307

*Admitted *Pro Hac Vice*