UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| F.V. and DANI MARTIN,<br><br>    Plaintiffs,<br><br>  v.<br><br>RUSSELL BARRON,[1] in his official capacity as Director of the Idaho Department of Health and Welfare; ELKE SHAW-TULLOCH, in her official capacity as Administrator of the Division of Public Health for the Idaho Department of Health and Welfare; and JAMES AYDELOTTE, in his official capacity as State Registrar and Chief of the Bureau of Vital Records and Health Statistics,<br><br>    Defendants. | Case No. 1:17-CV-00170-CWD<br><br><br>**MEMORANDUM DECISION AND ORDER (DKT. 28)** |

## INTRODUCTION

Transgender individuals born in Idaho cannot obtain a birth certificate with the listed sex matching their gender identity. The Idaho Department of Health and Welfare (IDHW) interprets state law to bar changes to the listed sex unless an applicant can show

---

[1] Russell Barron is now the Director of the Idaho Department of Health and Welfare. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Russell Barron is substituted for Richard Armstrong as a defendant in this suit.

**MEMORANDUM DECISION AND ORDER - 1**

there was an error of identification at birth. Therefore, as a policy, IDHW categorically and automatically denies applications to change the listed sex for any other reason. The questions presented to the Court are whether IDHW's interpretation, as applied, violates the Equal Protection and Due Process clauses of the Fourteenth Amendment to the Constitution of the United States, and whether it impermissibly compels speech in violation of the First Amendment.

As a preliminary matter, the Court notes the rare posture of the case. Plaintiffs, two transgender women born in Idaho, bring this action under 42 U.S.C. § 1983, asking the Court for a declaration that IDHW's policy violates their constitutional rights and the rights of others similarly situated. Plaintiffs request that the Court apply heightened scrutiny review, and declare that IDHW's policy violates the Equal Protection Clause. They also seek a ruling that the policy infringes upon due process rights to informational privacy, individual liberty, autonomy, and dignity. Plaintiffs request further that the Court find that IDHW's policy impermissibly compels speech in violation of the First Amendment to the Constitution. Plaintiffs ask the Court to enjoin Defendants, and others subject to the injunction, from enforcing the policy.

In turn, Defendants do not defend the constitutionality of the policy. Instead, *they admit* it is unconstitutional. Specifically, that it violates the Equal Protection Clause, failing minimum scrutiny review because "a prohibition against changing the sex designation on the birth certificate of a transgender individual who has undergone clinically appropriate treatment to permanently change his or her sex" bears no rational relationship to a conceivable government interest. (Ans. to First Am. Compl., Dkt. 19 at

**MEMORANDUM DECISION AND ORDER - 2**

2-3 ¶ 5.) Defendants assert that, once they have an order from the Court in hand, they will create a new rule permitting transgender individuals to change the sex listed on their birth certificates. (Oral Argument at 9:50, *F.V. v. Armstrong et al.*, No. 1:17-CV-00170-CWD (February 1, 2018).) Defendants indicate also that the new rule will include a provision that any revision history related to changes to the listed sex or name changes will not be marked on the reissued birth certificates of transgender individuals. Defendants further indicate they cannot proceed to create a rule until they receive a court order (Oral Argument at 9:51, *F.V. v. Armstrong et al.*, No. 1:17-CV-00170-CWD (February 1, 2018).)

Defendants assert that, because they have made these concessions, the Court should exercise judicial restraint and decide the Plaintiffs' motion on the narrowest ground—that the current policy, as applied, is not rationally related to a legitimate government interest, violates the Plaintiffs' equal protection rights, and is thus unconstitutional under minimum scrutiny review.

Plaintiffs counter that, in the face of pervasive government discrimination against transgender individuals, the Court has a constitutional duty and inherent authority to define the level of scrutiny that should be applied to their equal protection claim, and should determine favorable judgment is warranted on the basis of the other constitutional claims—in addition to fashioning a remedy mandating equal treatment.

The Court will not reach Plaintiffs' Due Process or First Amendment claims for the following reasons. First, the Court finds resolution of the Equal Protection Clause claim captures "the essence of the right in a more accurate and comprehensive way" than

**MEMORANDUM DECISION AND ORDER - 3**

the Due Process Clause, "even as the two Clauses may converge in the identification and definition of the right." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2603 (2015). The substance of Plaintiffs' First Amendment claim is that if a birth certificate is reissued to a transgender individual, and the reissued birth certificate includes the revision history, it will impermissibly compel speech—i.e. it will force an individual to disclose their transgender status when they would not ordinarily do so. Given Defendants' concession and agreement, the compelled speech concern falls away, and the merits of this claim need not be addressed by the Court.

After careful consideration, the Court finds IDHW's policy of categorically and automatically denying applications submitted by transgender individuals to change the sex listed on their birth certificates is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. The Court finds further that any constitutionally sound rule must not include the revision history as to sex or name to avoid impermissibly compelling speech and furthering the harms at issue. The Court notes also that the new rule should withstand heightened scrutiny review to fall within the contours of equal protection law. To reasonably assure the rule and remedy comply with such existing law, the Court will discuss the same after presenting the background, introducing the parties, and outlining the standard of review.

## BACKGROUND

### 1.    Idaho Vital Statistics Laws

States are responsible for the development and implementation of laws related to vital events such as recording births and deaths. However, most states, including Idaho,

**MEMORANDUM DECISION AND ORDER - 4**

use the Model State Vital Statistics Act published by the Centers for Disease Control and Prevention as a basis for state law.[2] The Idaho Vital Statistics Act (Act), Title 39, Chapter 2 of the Idaho Code, authorizes the Idaho Board of Health and Welfare (Board) to propose rules to carry out its provisions related to vital statistics—the Vital Statistics Rules (Rules). IDAPA 16.02.08.000. IDHW is the state agency responsible for enforcement of the Act and the Rules, (together, vital statistics laws) for providing the official interpretation of such laws, and for developing temporary and final proposed rules. State legislative approval is necessary to enact final proposed rules into law.

Idaho's vital statistics laws require that all amended birth certificates be marked as "amended," including a record of the nature of the change, unless the change is made under one of the following circumstances: (1) minor corrections made within one year after the date of the event necessitating the correction; (2) voluntary acknowledgements of paternity and non-paternity; and (3) for changes to name and paternal and maternal information in instances of adoption. Idaho Code §§ 39-250, 39-258-59; IDAPA 16.02.08.201. In these circumstances, the vital statistics laws require the amendments not be marked or noted on the birth certificate.[3] A catch-all provision applies to any

---

[2] *See Model State Vital Statistics Act and Model State Vital Statistics Regulations*, 2011 Revision, Centers for Disease Control and Prevention. Idaho's Vital Statistic Act is based in large part on the 1992 Revision of the model rules.

[3] For example: Idaho Code § 7-1106 allows a biological father to establish paternity via an affidavit of paternity. The affidavit must be signed by both the father and the birth mother. IDAPA 16.02.08.201.05.a. If the child's birth certificate lists a different person as the father, a court order is required to change the father's name. IDAPA 16.02.08.201.05.b. The reissued, amended birth certificate must not be marked amended or include any record of the paternity change. I.C. § 39-250(2), (3); IDAPA 16.02.08.201.05.c.

**MEMORANDUM DECISION AND ORDER - 5**

amendment not specifically provided for in the vital statistics laws. IDAPA 16.02.08.201.08. Notably, amendments made under the catch-all provision must be described on the birth certificate.

All applications to amend birth certificates are reviewed by the state registrar. The registrar's determination must serve the objectives of the vital statistics laws and the best interests of the public. IDAPA 16.02.08.201(e). When applications are denied, an individual has a right to petition a court for an order requiring the registrar make the requested amendment. Idaho Code § 39-250(5).

As explained above, IDHW interprets Idaho vital statistics law to prohibit changes to the listed sex unless there was an error in recording the sex at birth. Notably, IDHW asserts that Idaho birth certificates reflect the "sex" of a person at birth and do not contain a "gender marker" designation. (Ans. to First Am. Compl., Dkt. 23 at 2 ¶¶ 3-4.) From this interpretation comes IDHW's policy of automatically and categorically denying applications made by transgender individuals for the purpose of changing the listed sex to reflect their gender identity.[4]

## 2.    Biological Sex, Gender Identity, Transition

There is scientific consensus that biological sex is determined by numerous elements, which can include chromosomal composition, internal reproductive organs,

---

[4] Idaho counts as one of only four remaining states that do not permit transgender individuals to change the sex listed on their birth certificate. The other three states are Kansas, Ohio, and Tennessee. (Pl.s' Mem. of Law in Support of Mot. for Summ. Jgmt., Dkt. 28-1 at 19 n. 4.)

**MEMORANDUM DECISION AND ORDER - 6**

external genitalia, hormone prevalence, and brain structure.[5] Sex determinations made at birth are most often based on the observation of external genitalia alone. World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* at 97 (7th Version, 2011) (hereinafter "WPATH *Standards of Care*"). For most people, this determination aligns with gender identity and gender expression. *Id.* Of importance here, however, are instances where it does not.

Gender identity, also known as core gender, is the intrinsic sense of being male, female, or an alternative gender. WPATH *Standards of Care* at 96. Transgender is an adjective used to designate "a person whose identity does not confirm unambiguously to conventional notions of male or female gender."[6] Put another way, transgender is an adjective used to describe a person who has a gender identity that differs, in varying degrees, from the sex observed and assigned at birth. WPATH *Standards of Care* at 97.

Transgender individuals often suffer emotional distress in the process of recognizing and responding to the complex social and personal scenarios that result because their gender identity does not align with birth-assigned sex. (Dkt. 28-5 at 8; *See e.g.*, American Medical Association Resolution 122 (A-08) at 1 (2008)). A clinical

---

[5] The American Psychology Association defines sex as "one's biological status as either male or female" that "is associated primarily with physical attributes such as chromosomes, hormone prevalence, and external and internal anatomy." Transgender People, Gender Identity and Gender Expression, American Psychological Association (2018), http://www.apa.org/topics/lgbt/transgender.aspx (last visited Mar. 3, 2018).

[6] *Transgender*, OXFORD ENGLISH DICTIONARY, http://www.oed.com/view/Entry/247649?redirectedFrom=transgender#eid (last visited Feb. 7. 2018).

**MEMORANDUM DECISION AND ORDER - 7**

medical condition, known as gender dysphoria, can result from such distress.[7] *Id.*
Symptoms include anxiety and depression, suicidality, and other serious mental health
issues. *Id.;* WPATH *Standards of Care* at 25.

Transgender individuals, especially those suffering from gender dysphoria, often
proceed through a process known as transition, defined as follows:

> Transition is a period of time when individuals change from the
> gender role associated with their sex assigned at birth to a different
> gender role. For many people, this involves learning how to live
> socially in another gender role; for others this means finding a gender
> role and expression that is most comfortable for them. Transition may
> or may not include feminization or masculinization of the body
> through hormones or other medical procedures. The nature and
> duration of transition is variable and individualized.

WPATH *Standards of Care* at 97.

In other words, transition is the process where a person works to bring their lived
experience and outer appearance into alignment with their gender identity. Transition can
include medical treatments, such as hormone therapy and surgery, but is often limited to

---

[7] The American Psychiatric Association describes gender dysphoria as follows:

> People with gender dysphoria may often experience significant distress
> and/or problems functioning associated with this conflict between the way
> they feel and think of themselves (referred to as experienced or expressed
> gender) and their physical or assigned gender.

> The gender conflict affects people in different ways. It can change the way
> a person wants to express their gender and can influence behavior, dress
> and self-image. Some people may cross-dress, some may want to socially
> transition, others may want to medically transition with sex-change
> surgery and/or hormone treatment. Socially transitioning primarily
> involves transitioning into the affirmed gender's pronouns and bathrooms.

*Gender Dysphoria*, American Psychiatric Association, Physician review by Ranna
Parekh, M.D., M.P.H. (February 2016), https://www.psychiatry.org/patients-
families/gender-dysphoria/what-is-gender-dysphoria (last visited Mar. 5, 2018).

social transition. WPATH *Standards of Care* at 71, 97. Not all transgender people choose to undergo surgery as a part of the transition process. This is due to numerous potential factors, including whether surgery is medically necessary, and personal and financial factors such as lack of insurance coverage. (*See* First Am. Compl., Dkt. 19 at 6 ¶ 24; *see also* Ans. to First Am. Compl., Dkt. 19 at 5 ¶ 24.)

Social transition includes changes in clothing, name, pronouns, hairstyle, and identity documents to reflect one's gender identity. *Id.* at 9-10. "A complete transition is one in which a person attains a sense of lasting personal comfort with their gendered self, thus maximizing overall health, well-being, and personal safety." (Decl. of Dr. Randi Ettner, Dkt. 28-5 at 10.)

### 3.    Discrimination Against Transgender Individuals

Mismatches between identification documents and outward gender presentation can create risks to the health and safety of transgender people. Transgender people who present mismatched identification are verbally harassed, physically assaulted, denied service or benefits, or asked to leave the premises. James et al., *The Report of the 2015 U.S. Transgender Survey,* Washington D.C., National Center for Transgender Equality at 7 (2016) (hereinafter *Transgender Survey*).[8] According to the Federal Bureau of

---

[8] Defendants note the survey "acknowledges that respondents in the study 'were not randomly sampled and the actual population characteristics of transgender people in the U.S. are not known. Therefore, it is not appropriate to generalize the findings in this study to all transgender people.'" (Dkt. 19-6). The Court similarly acknowledges the limitations of the survey. Yet, the survey is also "the largest survey examining the experiences of transgender people in the United States, with 27,715 respondents from all fifty states ..." (*Transgender Survey* at 4.) Thus, the Court views the statistics presented in the report as a reliable indicator of harassment and violence across the population.

**MEMORANDUM DECISION AND ORDER - 9**

Investigation, 1.7 percent of all hate crimes reported by law enforcement agencies in the United States in 2015 were motivated by gender-identity bias. *2015 Hate Crime Statistics*, FBI, Criminal Justice Information Services Division, https://ucr.fbi.gov/hate-crime/2015/topic-pages/victims_final.pdf (last visited Mar. 5, 2018).

Statistics regarding the ongoing discrimination transgender individuals face highlight why involuntary disclosure of transgender status creates these risks. For instance, nearly twenty-five percent of surveyed college students, when perceived as a transgender person, were verbally, physically, or sexually assaulted in 2015. *Transgender Survey* at 9. This figure tracks the percentage of workers reporting mistreatment in the workplace due to gender identity. *Id.* at 10. More than seventy-five percent of transgender workers take steps to avoid such mistreatment at work by hiding or delaying their gender transition, or by quitting their job. *Id.* at 11.

Across all environments, almost fifty percent of transgender people surveyed for the 2015 report responded that they had been verbally harassed due to their gender identity. *Id.* at 13. Nearly one in ten reported being physically assaulted because of their gender identity. *Id.* Notably, the reported lifetime suicide attempt rate for transgender people is nearly nine times the rate of the United States population on average. *Id.* at 8.

## 4.     The Plaintiffs

Plaintiffs are two transgender women who were born in Idaho. Each Plaintiff has undergone the process of transition but is unable to obtain a birth certificate that reflects her gender identity.

**MEMORANDUM DECISION AND ORDER - 10**

F.V. is a 28-year-old woman born in Idaho. She is a transgender person who was assigned the sex of male at birth. Although F.V. states that she knew from approximately age 6 she was female, she began to live openly as a female when she was 15 years old. She has lived as a woman since that time, and asserts that doing so has been essential to her sense of self. F.V. relates that she "cannot imagine living life as a man" because she is not a man, and would be living a lie to try to do so. (Decl. of F.V., Dkt. 28-3 at 2.)

F.V. has taken steps, both medically and socially, to bring her body and expression of gender in line with her female gender identity.[9] Her social transition has included legally changing her name from a traditionally male name to a traditionally female one, and changing her name and gender on her driver's license, passport, and in her social security records. On March 17, 2017, F.V. contacted the Idaho Bureau of Vital Records and Health Statistics to inquire about changing the sex listed on her birth certificate. She was informed that IDHW does not consider such applications.

F.V. asserts that living with a birth certificate declaring she is male is a permanent and painful reminder that Idaho does not recognize her as she is—as a woman. Beyond this, she states that presenting an identity document that conflicts with her gender identity is both humiliating and dangerous: it puts her at risk of violence by disclosing against her will and intentions that she is a transgender individual.

---

[9] Defendants "admit that they are aware of no rational basis justifying a prohibition against changing the sex designation on the birth certificate of a transgender person who has undergone clinically appropriate treatment to permanently change his or her sex." (Ans. to First Am. Compl., Dkt. 23 at 2-3.) Defendants concede also, "that no rational basis justifies treating transgender persons like Plaintiffs differently than other persons." (Dkt. 23 ¶ 5.)

**MEMORANDUM DECISION AND ORDER - 11**

Dani Martin (Dani) is a 31-year-old woman born in Idaho. Dani is a transgender person who was assigned the sex of male at birth. Like F.V., Dani states that she knew from a young age she was female. However, fear of rejection and bullying prevented her from coming out when she was younger. With the support of her spouse and her family, Dani began to transition in 2014. She has lived her life openly as a woman since that time.

Like F.V., Dani has taken steps, both medically and socially, to bring her body and expression of gender in line with her female identity. Her social transition has included legally changing her name from a traditionally male name to a traditionally female one, and changing her name and gender on her driver's license and in her social security records. Like F.V., Dani has been unable to change the gender on her birth certificate due to Idaho's prohibitory policy.

The mismatch between Dani's gender identity and the sex listed on her birth certificate has exposed her to harassment and embarrassment. She asserts the mismatch has also prevented her from making the change in other important records—perpetuating instances where she is forced to disclose her transgender status, face embarrassment, harassment, and potential physical violence.

**5.    The Defendants**

The three Defendants are employees of IDHW. As supervisors and custodians of records, they are each variously responsible for the implementation, enforcement, development, and interpretation of Idaho's vital statistics laws.

**MEMORANDUM DECISION AND ORDER - 12**

Defendant Russell Barron is the Director of IDHW. He supervises the activities of IDHW, including the enforcement of the Vital Statistics Act, Vital Statistics Rules, and the agency's policies and interpretations of such laws.

Defendant Elke Shaw-Tullock is the Administrator of IDHW's Division of Public Health. The division includes the Bureau of Vital Records and Health Statistics. She supervises activities of the division, including enforcement of the Vital Statistics Act, Vital Statistics Rules, and the agency's policies and interpretations of such laws.

Defendant James Aydelotte is the State Registrar and Bureau Chief of the Bureau of Vital Records and Health Statistics at IDHW. He is the official custodian of vital records for the State of Idaho and also enforces the Vital Statistics Act, Vital Statistics Rules, and the agency's policies and interpretations of such laws.

## STANDARD OF REVIEW

1. **Standard of Review for Summary Judgment Motions**

Summary judgment is appropriate where a party can show, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead a tool to prevent factually insufficient claims or defenses "from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.

**MEMORANDUM DECISION AND ORDER - 13**

"The moving party is entitled to summary judgment if that party shows that each issue of material fact is not or cannot be disputed. To show the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact." *Ransier v. United States*, No. 2:12-CV-00538-EJL, 2014 WL 5305852, at *2 (D. Idaho Oct. 15, 2014); Fed. R. Civ. P. 56(c)(1)(A) & (B).

Federal Rule of Civil Procedure 56(e)(3) authorizes a court to grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it. The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, 'there must be evidence on which the jury could reasonably find for the [non-moving party].'" *Ransier* at *2 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)).

**2.     Standard for Permanent Injunction**

To prevail on a motion for a permanent injunction, plaintiffs must demonstrate: (1) they have suffered an irreparable injury or harm; (2) remedies available at law are inadequate to compensate for such injury or harm; (3) considering the balance of hardships between the parties, an equitable remedy is warranted; and (4) public interest is not disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

**MEMORANDUM DECISION AND ORDER - 14**

When a court grants injunctive relief, it must tailor the remedy to the specific harm shown by plaintiffs. *Hawaii v. Trump*, 859 F.3d 741, 785 (9th Cir.), *cert. granted sub nom. Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 198 L. Ed. 2d 643 (2017), *and cert. granted, judgment vacated*, 138 S. Ct. 377 (2017), *and vacated*, 874 F.3d 1112 (9th Cir. 2017); *Califano v. Tamasaki*, 422 U.S. 682, 702 (1979). The scope of the remedy fashioned by a court is dictated by the extent of the violation established by the plaintiffs. 859 F.3d 741, 785. Aside from these parameters, a court has significant discretion in fashioning an appropriate and proportionate remedy. *Id.*

## LEGAL FRAMEWORK

### 1.    The Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment requires that all similarly situated people be treated alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). Equal protection requirements restrict state legislative action that is inconsistent with bedrock constitutional guarantees, such as equality in treatment. *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2603 (2015). An equal protection claim is established when plaintiffs show they were treated differently than other similarly situated people. *City of Cleburne* at 439-440. Yet, states are given significant leeway to establish laws to effectively govern citizens and remedy societal ills. *Romer v. Evans*, 517 U.S. 620, 631 (1996). Because of this, successful equal protection claims additionally require plaintiffs to show the difference in treatment was the result of intentional or purposeful discrimination. *Stone v. Trump*, No. CV MJG-17-2459, 2017 WL 5589122, at *15 (D. Md. Nov. 21, 2017).

**MEMORANDUM DECISION AND ORDER - 15**

In this matter, Plaintiffs, transgender individuals born in Idaho, have adequately alleged they were treated differently from non-transgender people born in Idaho. IDHW practices a policy of automatically and categorically denying applications made by transgender people to amend the birth-assigned sex on their birth certificates to align with their gender identity. Plaintiff F.V. contacted IDHW to inquire about amending her birth certificate to align with her gender identity. IDHW informed F.V., consistent with its policy, that it does not consider applications made on that basis. Plaintiff Dani Martin's experience was the same. The IDHW Defendants provide no justification for the policy.

Yet, in turn, IDHW permits some classes of people, adoptive parents for instance, to make amendments to birth certificates without record of the amendment on the reissued certificate. IDHW has similar laws and policies related to the change of paternal information. These laws give certain people access to birth certificates that accurately reflect who they are, while denying transgender people, as a class, access to birth certificates that accurately reflect their gender identity. Therefore, as Defendants concede, Plaintiffs' equal protection claims are valid.

The Supreme Court of the United States has set forth a framework of tiered review for equal protection claims. *Latta v. Otter*, 19 F. Supp. 3d 1054, 1073 (D. Idaho), *aff'd*, 771 F.3d 456 (9th Cir. 2014). Each tier of scrutiny requires a different level of justification for the challenged law. *Id.* The level of scrutiny applied to the law is determined by the type of classification at issue. *Id.* If a law classifies on the basis of a suspect class or a quasi-suspect class, it is subject to heightened scrutiny review—and, depending on the type of suspect classification, such laws are subject to either strict

scrutiny review or intermediate scrutiny review. If a law does not classify on the basis of a suspect or quasi-suspect class, it is subject to minimum scrutiny—commonly called rational basis review. *Heller v. Doe,* 509 U.S. 312, 319–21 (1993).

Therefore, the most stringent level of review is strict scrutiny. The Supreme Court has carefully defined the limits of this level of review. It is applied when laws impermissibly interfere with fundamental rights or to the disadvantage of a suspect class. *Latta*, 19 F. Supp.3d at 1073. Strict scrutiny applies to classifications based on race, alienage, and national origin. IDWH's policy makes a classification based on transgender status. Therefore, under clear Supreme Court precedent, it does not trigger strict scrutiny review.

In contrast, the most lenient level of scrutiny is rational basis review. This level of review is applied to laws that impose a difference in treatment between groups but do not infringe upon a fundamental right, or target a suspect or quasi-suspect class. *Heller* at 319–21. In such instances, if a court can identify any rational basis supportive of the government's need for the law, it is upheld. *Id.* In this matter, IDHW Defendants concede no rational basis exists to support the categorical denial of requests to amend sex-assigned birth on the basis of correcting it to match one's gender identity.

The Court notes the importance and potential implications of restrictions and restraints IDHW may place on the ability of transgender people to apply for and receive approval of applications to change the sex listed on their birth certificates. Because the Court does not have a proposed rule before it, it will not extrapolate on the potential legal ramifications of such restrictions—such topics are not ripe for its consideration.

**MEMORANDUM DECISION AND ORDER - 17**

However, any new rule must not subject one class of people to any more onerous burdens than the burdens placed on others without constitutionally-appropriate justification—for instance, to apply for a change in paternity information the applicant is not required to submit medical evidence, such as DNA confirmation, to prove paternity or non-paternity. Yet, all applicants for name changes are required to obtain a court order—regardless of the reason for the change. (*See supra* note 3 and accompanying text.)

The Court agrees there is no rational basis to support IDHW's policy. The following facts make this conclusion apparent: (1) IDHW already has a process in place for making amendments to birth certificates, as is evidenced by Idaho's vital statistics laws; (2) the vital statistics laws make certain that amendments or corrections are kept confidential when they pertain to sensitive personal and potentially private information, such as paternity or adoptive status; and (3) the laws make room for the amendment of any other information on the birth certificate with the proper form of application and evidence.

Thus, under an alternative, constitutionally-sound reading of Idaho's vital statistics laws, amendments to the listed sex are not only possible, but procedures are in place to facilitate such amendments—and the Act allows the Board to draft a rule that does just that.[10] As such, there is no rational basis for denying transgender individuals birth certificates that reflect their gender identity and IDHW's policy, as applied, violates the Equal Protection Clause.

---

[10] Idaho Code §§ 39-241(3); 39-250.

**MEMORANDUM DECISION AND ORDER - 18**

Yet, as explained above, Plaintiffs ask the Court to take a step further to find that IDHW's policy similarly fails to withstand heightened scrutiny, which includes the mid-tier of equal protection review—intermediate scrutiny. Historically, intermediate scrutiny applies to quasi-suspect classifications based on sex and illegitimacy. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). For quasi-suspect classifications to be upheld, the state must show the classification is substantially related to an important governmental objective. "The purpose of this heightened level of scrutiny is to ensure quasi-suspect classifications do not perpetuate unfounded stereotypes or second-class treatment." *Latta v. Otter*, 19 F. Supp. 3d 1054, 1073 (D. Idaho), *aff'd*, 771 F.3d 456 (9th Cir. 2014) (citing *United States v. Virginia*, 518 U.S. 515, 534 (1996)).

Plaintiffs argue that IDHW's refusal to treat transgender people like others of the same sex, i.e. other males or females, requires intermediate review because such treatment discriminates on the basis of sex or otherwise employs another quasi-suspect classification—transgender status. In other words, Plaintiffs suggest two ways for the Court to conclude that heightened scrutiny applies to government classifications based on transgender status. The first—the Court could find that discrimination based on transgender status is discrimination based on sex or gender. The second— the Court could conclude that transgender status is a suspect classification in and of itself. In either case, Plaintiffs contend IDHW's policy is not substantially related to an important governmental objective and fails intermediate scrutiny review. The merits of both prongs of the Plaintiffs' argument will be discussed in turn.

**MEMORANDUM DECISION AND ORDER - 19**

## A.        *Discrimination Based on Sex and Gender*

In 1977, the United States Court of Appeals for the Ninth Circuit held rational

basis review appropriately applied to classifications based on "transsexual" status,

because sex-based discrimination in the context of Title VII included only discrimination

based on one's anatomical gender—not a change in one's gender or gender identity.

*Holloway v. Arthur Andersen & Co.*, 566 F.2d 659 (9th Cir. 1977). Although the Ninth

Circuit has not revisited the question, the reasoning employed in *Holloway* relies on

markedly outdated notions of sex and gender that strongly indicate, that should it be

presented today, the same holding would not issue.[11]

The Supreme Court's decision in *Price Waterhouse* is particularly important to the

development of a more robust understanding of sex-based gender discrimination in the

law. *Price Waterhouse*, 490 U.S. 228, 240 (1989). There, the Court held that Title VII

bars discrimination based on the fact that a person is a woman or a man, *and* based on the

fact that a person fails to act like a woman or a man—i.e. it protects people from

discrimination based on their failure to adhere to society's expectations of traditional

gender roles. *Id.*

In 2000, the Ninth Circuit employed the reasoning from *Price Waterhouse* in a

new statutory context. *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000). In

*Schwenk*, the Ninth Circuit held that violence perpetrated against a transgender person,

---

[11] At that time, the court found that "transsexuals" were not an insular minority, and found also that transsexuality was not a "immutable characteristic determined solely by accident of birth." *Id.* at 663-64. The court remarked: "[T]he complexities involved merely in defining the term 'transsexual' would prohibit a determination of suspect classification for transsexuals." *Holloway* at 663 (footnote omitted).

**MEMORANDUM DECISION AND ORDER - 20**

because they presented as a certain gender, was violence motivated by gender for purposes of the Gender Motivated Violence Act. *Id.* Since *Schwenk*, at least one court in the Ninth Circuit has held *Schwenk's* reasoning supports the follow-on conclusion that discrimination against transgender people is a form of sex discrimination subject to intermediate scrutiny review. *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1121 (N.D. Cal. 2015) (where the court found that *Schwenk* overruled the specific conclusions on which the *Holloway* decision relied); *see also Olive v. Harrington*, 2016 WL 4899177, at \*5 (E.D. Cal. Sept. 14, 2016) and *Marlett v. Harrington*, No. 115CV01382MJSPC, 2015 WL 6123613, at \*4 (E.D. Cal. Oct. 16, 2015) (*pro se* screening orders citing *Norsworthy*, stating discrimination on the basis of transgender status is subject to intermediate scrutiny).

Of particular importance, significant changes in the medical understanding of gender identity call for a reexamination of its place in the equal protection context in relation to sex-based discrimination. *Duronslet v. Cty. of Los Angeles*, 266 F. Supp. 3d 1213, 1223 (C.D. Cal. 2017) (discussing advances since *Holloway v. Arthur Andersen & Co.*, 566 F. 2d 659 (9th Cir. 1977). "[I]t would not be inconsistent with *Holloway* … to conclude, based on an adequately developed factual record, that our current understanding of transgenderism requires the application of heightened scrutiny." *Id.*

Indeed, our medical understanding of biological sex and gender has advanced significantly in the forty-one years since *Holloway*. For instance, it is universally acknowledged in leading medical guidance that not all individuals identify as the sex they

**MEMORANDUM DECISION AND ORDER - 21**

are assigned at birth.[12] Despite the ongoing study to more fully understand the impact of differences in chromosomes, brain structure and chemistry, there is medical consensus that gender identity plays a role in an individual's determination of their own sex. Therefore, to conclude discrimination based on gender identity or transsexual status is not discrimination based on sex is to depart from advanced medical understanding in favor of archaic reasoning.

### B.        *Defining New Suspect Qualifications – Transgender Status*

In the equal protection context, the Supreme Court "has recognized that new insights and societal understandings can reveal unjustified inequality […] that once passed unnoticed and unchallenged." [13] *Obergefell v. Hodges*, 135 S. Ct. 2584, 2603 (2015). The Supreme Court employs a four-factor test to determine whether a class qualifies as suspect or quasi-suspect. *United States v. Windsor*, 570 U.S. 744 (2013). Heightened scrutiny is warranted where the state discriminates against a class that (1) has been "historically subjected to discrimination," (2) has a defining characteristic bearing no "relation to ability to perform or contribute to society," (3) has "obvious, immutable,

---

[12] As set forth in WPATH *Standards of Care* protocols for the care of transgender and gender nonconforming people, including individuals with gender dysphoria. The WPATH protocols are endorsed by the following medical associations: The *American Medical Association*, the *Endocrine Society*, the *American Psychological Association*, the *American Psychiatric Association*, the *World Health Organization*, the *American Academy of Family Physicians*, the *National Commission of Correctional Health Care,* the *American Public Health Association*, the *National Association of Social Workers,* the *American College of Obstetrics and Gynecology*, the *American Society of Plastic Surgeons*, and *The American Society of Gender Surgeons.* (*See* Dkt. 28-5 at 8.)

[13] Responding to such insights and societal understandings, the Supreme Court has invalidated laws that imposed sex-based inequality in marriage, and inequalities in the institution of marriage arising from sex-based prohibitions. *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2604 (2015).

**MEMORANDUM DECISION AND ORDER - 22**

or distinguishing characteristics," and (4) is "a minority or is politically powerless." *Windsor v. United States*, 570 U.S. 744 (2013).

Courts have applied this test and have found that government discrimination based on transgender status is discrimination against a quasi-suspect class and thus is subject to intermediate scrutiny. *Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015).[14] For example, in *Adkins*, a transgender person who had been arrested and imprisoned sued New York City and its officials, alleging equal protection violations based on discriminatory confinement conditions. *Id.* The court employed the test and found transgender people are a quasi-suspect class:

> (1) Transgender people have suffered a history of persecution and discrimination (moreover this history of persecution and discrimination is not yet history); (2) Transgender status bears no relation to ability to contribute to society- i.e. simply by virtue of their status they are not any less productive than any member of society; (3) Transgender status is a sufficiently discernible characteristic to define a discrete minority class; (4) Transgender people are a politically powerless minority.

*Id.*

Similarly, in *Evancho v. Pine-Richland School Dist.*, the court concluded intermediate scrutiny applies to classifications based on transgender status. 237 F. Supp. 3d 267 (W.D. Pa. 2017). There, pursuant to a school board resolution, transgender high

---

[14] *See Stone v. Trump*, No. CV MJG-17-2459, 2017 WL 5589122 (D. Md. Nov. 21, 2017) (finding transgender individuals appear to satisfy the criteria of at least a quasi-suspect classification, and that the classification at issue was a form of discrimination on the basis of gender); *A.H. v. Minersville Area School District*, No. 3:17-CV-391, 2017 WL 5632662, at *7 (M.D. Pa. Nov. 22, 2017) (both the parties and the court agreed heightened scrutiny applied to a transgender girl's equal protection claims when she was excluded from using the girl's bathroom at school because the sex listed on her birth certificate was male).

**MEMORANDUM DECISION AND ORDER - 23**

school students were limited to using either single-user bathrooms or bathrooms

matching their birth-assigned sex. The court acknowledged that the transgender students'

gender identity was:

> … deeply ingrained and inherent in their very beings. Like "sex," […] gender identity is neither transitory nor temporary. Further, what buttresses that conclusion is the fact that the school community as a whole treats these Plaintiffs in all other regards consistently with their stated gender identities, along with the reality that these Plaintiffs live all facets of their lives in a fashion consistent with their stated and experienced gender identities.

*Id*. at 289.

The findings in *Adkins* and *Evancho* echo findings made regarding homosexual

people as a class and recognized by this Court in *Latta*, the Ninth Circuit in *SmithKline*,

and the Supreme Court in *Windsor* and *Obergefell*. Applying the four factor analysis, the

cases found: (1) homosexual people have endured persecution and discrimination; (2)

sexual orientation has no relation to aptitude or ability to contribute to society; (3)

homosexual people are a discernable group with non-obvious distinguishing

characteristics; and (4) the class is a politically weakened minority.

The pervasive and extensive similarities in the discrimination faced by transgender

people and homosexual people are hard to ignore: (1) transgender people have been the

subject of a long history of discrimination that continues to this day; (2) transgender

status as a defining characteristic bears no "relation to ability to perform or contribute to

society; (3) transgender status and gender identity have been found to be "obvious,

immutable, or distinguishing characteristic[s];" and (4) transgender people are

unarguably a politically vulnerable minority. *Norsworthy*, 87 F. Supp. 3d at 1119 n.8;

**MEMORANDUM DECISION AND ORDER - 24**

*Adkins*, 143 F. Supp. 3d at 140; *See generally, SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 481-84 (9th Cir. 2014). This is especially true in Idaho where transgender people have no state constitutional protections from discrimination based on their transgender status in relation to employment decisions, housing, and other services. Therefore, transgender people bear all of the characteristics of a quasi-suspect class and any rule developed and implemented by IDHW should withstand heightened scrutiny review to be constitutionally sound.

## CONCLUSION

Defendants, as conceded, violate the Equal Protection Clause by failing to provide an avenue for transgender people to amend the sex listed on their birth certificates. Plaintiffs have sufficiently demonstrated that they have suffered irreparable injury and harm that cannot be remedied by ordinary remedies at law—and by Defendants' acknowledgment, IDHW cannot proceed to create a new rule to remedy the harm without a court order. Furthermore, the balance of the hardships warrants an equitable remedy, because allowing such amendments would pose no new burden on Defendants: Idaho vital statistics laws allow IDHW to create and implement a constitutionally-sound rule, and IDHW already has in place processes and procedures to facilitate the amendment of birth certificates in the ordinary course of its everyday activities. Finally, the public interest is not disserved by a permanent injunction. A rule providing an avenue to obtain a birth certificate with a listed sex that aligns with an individual's gender identity promotes the health, well-being, and safety of transgender people without impacting the rights of others.

**MEMORANDUM DECISION AND ORDER - 25**

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      The Court **GRANTS in part** and **DENIES in part** Plaintiff's Motion for
        Summary Judgment. (Dkt. 28.)

2)      The Court **PERMANENTLY ENJOINS** the IDHW Defendants and their
        officers, employees, and agents from practicing or enforcing the policy of
        automatically rejecting applications from transgender people to change the
        sex listed on their birth certificates.

3)      IDHW Defendants and their officers, employees, and agents must begin
        accepting applications made by transgender people to change the sex listed
        on their birth certificates **on or before April 6, 2018**; such applications
        must be reviewed and considered through a constitutionally-sound approval
        process; upon approval, any reissued birth certificate must not include
        record of amendment to the listed sex; and where a concurrent application
        for a name change is submitted by a transgender individual, any reissued
        birth certificate must not include record of the name change.

**IT IS SO ORDERED.**

DATED: March 05, 2018

_Candy W. Dale_
Candy W. Dale
U.S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 26**