Peter C. Renn (Admitted *Pro Hac Vice*)
prenn@lambdalegal.org
Nora Huppert (Pending Admission *Pro Hac Vice*)
nhuppert@lambdalegal.org
Lambda Legal Defense and Education Fund, Inc.
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
Tel: (213) 382-7600 | Fax: (213) 351-6050

Kara N. Ingelhart (Admitted *Pro Hac Vice*)
kingelhart@lambdalegal.org
Lambda Legal Defense and Education Fund, Inc.
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
Tel: (312) 663-4413 | Fax: (312) 663-4307

Monica G. Cockerille (ISB No. 5532)
monica@cockerillelaw.com
Cockerille Law Office, PLLC
100 W. Main St., Ste. 204
Boise, ID 83702
Tel: (208) 343-7676 | Fax: (866) 226-2499

Attorneys for Plaintiffs F.V. and Dani Martin

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| F.V. and DANI MARTIN,<br><br>*Plaintiffs*,<br><br>v.<br><br>DAVID JEPPESEN,[1] in his official capacity as Director of the Idaho Department of Health and Welfare; ELKE SHAW-TULLOCH, in her official capacity as Administrator of the Division of Public Health for the Idaho Department of Health and Welfare; and JAMES AYDELOTTE, in his official capacity as State Registrar and Chief of the Bureau of Vital Records and Health Statistics,<br><br>*Defendants*. | No. 1:17-cv-00170-CWD<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLARIFICATION OF MARCH 5, 2018 ORDER** |

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), David Jeppesen, the current director of the Idaho Department of Health and Welfare, is automatically substituted for Russell Barron.

**TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................................1

BACKGROUND ............................................................................................................................2

I.     Defendants' Categorical Denial of Applications by Transgender People to Amend Their Birth Certificates in Order to Match Their Gender Identity Before 2018 .................2

II.    This Court's 2018 Decision Holding Defendants' Categorical Denial Unconstitutional and Permanently Enjoining its Enforcement ......................................................................2

III.   Defendants' Compliance with the Court Order from 2018-2020 .........................................4

IV.   Enactment of HB 509 ............................................................................................................5

      A.    Summary of Relevant Provisions of HB 509 .............................................................5

      B.    Lawmaker Statements on HB 509 ..............................................................................7

STANDARD ...................................................................................................................................8

ARGUMENT ..................................................................................................................................9

I.     HB 509 Violates this Court's 2018 Ruling and the Permanent Injunction. .........................9

II.    Any Relief From the Permanent Injunction Would Require a Motion to Dissolve. ..........13

CONCLUSION .............................................................................................................................14

**INTRODUCTION**

If this Court emphasized one point in its 2018 ruling in this action, it was that Idaho state officials could not categorically ban transgender people from correcting their birth certificates for the purpose of matching their gender identity.  In defiance of that constitutional ruling, which was backed by the force of a permanent injunction from this Court, Idaho has now enacted House Bill 509 ("HB 509"), which seeks to reinstate a categorical ban.  HB 509 is stunningly lawless:  it requires exactly what this Court's ruling prohibits.  As this Court already recognized, transgender people face a heightened risk of harassment, discrimination, and even violence when they are denied access to birth certificates matching their gender identity.  That is why this Court permanently enjoined Defendants from categorically denying such certificates to transgender people and, indeed, affirmatively ordered Defendants to permit transgender people to correct their certificates in order to match their gender identity within a month of its ruling.

Despite the irreconcilable conflict between this Court's injunction and HB 509, Defendants deny that the injunction bars HB 509 and will therefore enforce that law when it takes effect on July 1, 2020.  In light of these circumstances, Plaintiffs request that this Court confirm what, in candor, should already be clear to Defendants:  that enforcement of HB 509 is already barred by this Court's 2018 ruling and specifically its permanent injunction.  Such clarification may also deter Defendants from undertaking contemptuous conduct that would otherwise require this Court's intervention.  To the extent that Defendants nevertheless seek to enforce HB 509, they would need to file a motion to dissolve the permanent injunction rather than unilaterally deciding that the permanent injunction no longer applies.

Plaintiffs respectfully request that this Court issue a decision on the motion as expeditiously as possible—and, if feasible, no later than June 1, 2020—because in the event that

this Court holds that HB 509 falls outside the scope of the injunction, further litigation will be necessary to enjoin the law before July 1, 2020.

## BACKGROUND

**I.  Defendants' Categorical Denial of Applications by Transgender People to Amend Their Birth Certificates in Order to Match Their Gender Identity Before 2018**

Before this Court's ruling in 2018, the Idaho Department of Health and Welfare ("IDHW") "practice[d] a policy of automatically and categorically denying applications made by transgender people to amend the birth-assigned sex on their birth certificates to align with their gender identity." *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1141 (D. Idaho 2018).  Thus, for example, transgender women like Plaintiffs F.V. and Dani Martin, who were assigned male at birth, were unable to obtain birth certificates with a listed sex—also referred to as a gender marker—consistent with their female gender identity. *Id.* at 1138-39.

According to Defendants, this policy and practice of categorically denying the gender marker corrections sought by transgender people was required by state law. *Id.* at 1134. Defendants' view was that "no Idaho law permits a change to the sex designation on a birth certificate, except in the case of error." Dkt. 23 at 37. While gender marker corrections were therefore always permitted where there was an "error"—such as when a person's birth certificate failed to record that person's actual birth-assigned sex—that did not provide any avenue for the corrections sought by transgender people. *F.V.*, 286 F. Supp. 3d at 1134. The first sentence of this Court's order succinctly identified the problem:  "Transgender individuals born in Idaho cannot obtain a birth certificate with the listed sex matching their gender identity." *Id.* at 1133-34.  As discussed below, that is precisely the status quo ante that HB 509 seeks to restore.

**II.  This Court's 2018 Decision Holding Defendants' Categorical Denial Unconstitutional and Permanently Enjoining its Enforcement**

In March 2018, this Court held that Defendants' categorical denial of gender marker

2

corrections for transgender people was unconstitutional. Mismatches between one's identity documents and one's gender identity endanger the health and safety of transgender people, exposing them to risk of harassment and even violence. *F.V.*, 286 F. Supp. 3d at 1137. This Court found that Defendants had discriminated against transgender people without even a rational basis, a point that Defendants had also conceded. *Id.* at 1141-42. In light of that equal protection ruling, this Court did not need to base its decision on Plaintiffs' due process or compelled speech claims; but it explained that this was only because the underlying injury at issue—involuntary disclosure of one's transgender status—was already redressed through the equal protection claim. *Id.* at 1135.

Although this Court made clear that Defendants could not categorically deny the gender marker corrections sought by transgender people, it also recognized the need to identify the level of constitutional scrutiny. This Court expressed concern that "restrictions and restraints . . . on the ability of transgender people to apply for and receive approval of applications to change the sex listed on their birth certificates" could lack "constitutionally-appropriate justification." *Id.* at 1141-42 (noting analogous correction requests did not require submitting medical evidence).

This Court held that heightened scrutiny was required, both because discrimination against transgender people is a form of sex-based discrimination, and because such discrimination bears all the indicia of at least a quasi-suspect classification. *Id.* at 1142-45. This Court observed that "there is medical consensus that gender identity plays a role in an individual's determination of their own sex" and that "to conclude discrimination based on gender identity or transsexual status is not discrimination based on sex is to depart from advanced medical understanding in favor of archaic reasoning." *Id.* at 1144; *accord id.* at 1136 (confirming "scientific consensus" that "biological sex is determined by numerous elements,"

3

including brain structure).

This Court ordered injunctive relief with both prohibitory and mandatory elements and declared Defendants' conduct unconstitutional. First, this Court permanently enjoined "Defendants and their officers, employees, and agents . . . from practicing or enforcing the policy of automatically rejecting applications from transgender people to change the sex listed on their birth certificates." *Id.* at 1146; *see also* Dkt. 43 (judgment). Second, this Court mandated that Defendants were required to "accept[]" such applications through a constitutionally-sound approval process and even set a deadline of April 6, 2018 for doing so. *F.V.*, 286 F. Supp. 3d at 1146. This Court noted that any concurrently sought name change should not be disclosed on the reissued birth certificate, as such revision history could disclose an individual's transgender status and thereby undermine the purpose of reissuing the certificate. Finally, this Court granted Plaintiffs' request to "declare that IDHW's policy violates the Equal Protection Clause" as to them and all others similarly situated by holding that Defendants "violate the Equal Protection Clause by failing to provide an avenue for transgender people to amend the sex listed on their birth certificates." *Id.* at 1134, 1145.

## III. Defendants' Compliance with the Court Order from 2018-2020

Following this Court's order, IDHW adopted a temporary and proposed rule ("Rule") that went into effect on April 6, 2018. Dkt. 42-1. The Rule requires the Registrar of Vital Statistics to issue an amended birth certificate where an individual submits "[a] declaration that the registrant's indicator of sex on the Idaho certificate of birth does not match the registrant's gender identity." *Id.* Based on the "expectation that the substance of the Rule will remain in place," Dkt. 42 at 4, the parties agreed that the Court could enter judgment, which was issued on April 20, 2018, Dkt. 43.

Defendants did not appeal the judgment.

Even at the administrative level, however, there were subsequent efforts to impose what this Court referred to as "restrictions and restraints . . . on the ability of transgender people to apply for and receive approval of applications to change the sex listed on their birth certificates." *F.V.*, 286 F. Supp. 3d at 1141.  For example, although subsequently vacated on procedural grounds, the Board of Health and Welfare amended the Rule in 2019 to require that minors must submit supporting attestation from a health care professional, in addition to complying with preexisting requirements such as obtaining parental consent.  Sen. Martin, who serves on the Board, admitted that he advocated for this medical attestation requirement because it deterred minors from obtaining gender marker corrections.  Betsy Russell, *Feeling the angst: Idaho Senate committee chair balances religious views, 'hateful' bills*, KTVB7 (Mar. 8, 2020) ("Martin said he liked the administrative rule that was briefly in effect. 'It was working,' he said, as the numbers of minors changing their birth certificate markers declined.").[1]  These efforts were rooted in disapproval of transgender people correcting their gender markers.  *Id.* ("'The status quo is not acceptable to me,' said Martin, who acknowledged that his religious views play into his attitudes on the issue. 'Your sex is your sex — to me, that doesn't really change.'").

## IV.     Enactment of HB 509

### A.     Summary of Relevant Provisions of HB 509

On March 30, 2020, Governor Little signed HB 509 (attached), which amends the Idaho Vital Statistics Act, Title 39, Chapter 2 of the Idaho Code, effective July 1, 2020.  On that same day, he also signed HB 500, which bans transgender girls from participating in sports.

As relevant here, HB 509 reinstates a categorical ban on transgender people correcting

---

[1] https://www.ktvb.com/article/news/politics/feeling-the-angst-idaho-senate-committee-chair-balances-religious-views-hateful-bills/277-574f5f05-6c75-43b5-aabc-fb6857c4db2c

the gender marker on their birth certificate for the purpose of matching their gender identity. HB 509 mandates that birth certificates must include "sex," which it defines to the exclusion of gender identity: "'sex' means the immutable biological and physiological characteristics, specifically the chromosomes and internal and external reproductive anatomy, genetically determined at conception and generally recognizable at birth, that define an individual as male or female." HB 509, § 2(3). Indeed, HB 509 states that alteration of birth certificates based on what lawmakers derisively refer to as "subjective feelings" is improper. *Id.*, § 1(2)(h).

Thus, for example, HB 509 deems that the "correct" gender marker for a transgender woman who was assigned male at birth based on her reproductive anatomy is male. Such a woman cannot change the gender marker on her birth certificate to female for the purpose of matching her gender identity. As was true before this Court's ruling in 2018, HB 509 provides for changes to the gender marker if there was an error but, under HB 509's definition of "sex," there was no such error for such a woman. *Id.*, § 2(4) (providing for amendment within one year of birth where the certificate "incorrectly represents a material fact at the time of birth" and after one year of birth where there was a "material mistake of fact"). HB 509 did not change IDHW's authority to make certain other birth certificate corrections, such as when there is a voluntary acknowledgement of paternity or non-paternity. *Cf. F.V.*, 286 F. Supp. 3d at 1135.

Although transgender people will have been able to correct their gender markers to match their gender identity for more than two years by the time HB 509 takes effect, the law contains no factual support to show any harm that was caused by permitting such corrections. That is consistent with this Court's holding that "providing an avenue to obtain a birth certificate with a listed sex that aligns with an individual's gender identity promotes the health, well-being, and safety of transgender people without impacting the rights of others." *Id.* at 1145-46. Instead, HB

6

509 baldly asserts that it is justified by interests in tracking health data and promoting "national security," such as "expos[ing] covert bioterrorists attacks." HB 509, § 1(2)(f)-(g).

### B. Lawmaker Statements on HB 509

Lawmakers enacted HB 509 as a direct effort to defy this Court's ruling. Rep. Young, who sponsored the bill in the Idaho House, exclaimed in an op-ed: "The one thing the Idaho Vital Statistics Act does NOT do is cede to an activist judiciary the legislative authority to redefine legal terms." Julianne Young, Opinion, *Facts don't discriminate*, The Jefferson Star (Mar. 18, 2020).[2] She advocated for HB 509 to rebuke what she characterized as this Court's "assumption" in *F.V.* "that biological sex and gender identity were the same thing," which she believes "is simply not true." *Id.* Rep. Young denigrated this Court's ruling as "the epitome of judicial activism, with Judge Dale pushing a politicized agenda rather than following established law." Julianne Young, Opinion, *Rep. Julianne Young: Public deserves more than half-truths*, The Spokesman-Review (Dec. 13, 2019).[3]

Other lawmakers expressed a similar refusal to abide by this Court's ruling. Rep. Zollinger urged passage of HB 509 because he felt this Court was "telling us as a state exactly what we can and cannot do and that is not the role of the court. That's our job to decide." Feb. 27, 2020 House Floor at 1:27:05.[4] Sen. Heider voted for HB 509 because, in his view, "boys are boys, and girls are girls" and "no judge, no Health and Welfare Department is going to change that reality." Mar. 17, 2020 Senate Floor at 6:53:05. Strikingly, these statements illustrate that HB 509's conflict with this Court's ruling was seemingly an incentive—rather than a deterrent—

---

[2] https://www.postregister.com/star/opinion/facts-don-t-discriminate/article_72bc3bfe-6600-50aa-84cb-8f81e1ee284d.html
[3] https://www.spokesman.com/stories/2019/dec/13/rep-julianne-young-public-deserves-more-than-half-/
[4] Recordings of the legislative proceedings on HB 509 are available at https://lso.legislature.idaho.gov/MediaArchive/MainMenu.do.

7

to those supporting its passage.

Meanwhile, other lawmakers cautioned that HB 509 violated this Court's ruling. Rep. Green explained the bill "deliberately flies in the face of the recent court order." Feb. 21, 2020 House State Affairs Comm. at 1:57:20. Rep. Gannon agreed that the bill "expressly conflicts with the court decision." Feb. 27, 2020 House Floor at 1:20:08. Rep. Smith concurred that the bill "is a violation of [a] federal court ruling." Feb. 21, 2020 House State Affairs Comm. at 1:55:30. Indeed, Rep. Hartgen, joined by her Republican colleague Rep. Ricks, voted against the bill—breaking an otherwise party-line vote—because, as a former employee of the state judicial system, she explained, "The federal court . . . is a stopper for me. Being part of the court system for so long, it is hard for me not to follow court orders." Feb. 27, 2020 House Floor at 1:24:57.

Members of Senate echoed these concerns. Sen. Stennett explained that the bill was "an intentional violation of the law" and "constitute[d] contempt of court." Mar. 17, 2020 Senate Floor at 6:22:38, 6:25:20. She added that, per the Attorney General's opinion, an award of attorneys' fees against the government was likely, and that it could exceed one million dollars. *Id.* at 6:26:30. Similarly, Sen. Burgoyne explained why the rule of law depends upon abiding by how a court rules: "democracy demands that we be good losers, as well as good winners, because at the end of the day, it's all about figuring out how to live together." *Id.* at 6:49:44. Sen. Martin admitted, "We've had someone say that this is unconstitutional. That was their opinion. Of course, it's a federal judge." *Id.* at 6:37:50. But he nonetheless voted for HB 509.

**STANDARD**

"A district court has discretion to clarify the scope of an injunction." *Smagin v. Yegiazaryan*, No. 14-9764, 2020 WL 1652347, at *3 (C.D. Cal. Apr. 1, 2020). The Supreme Court has explained that "courts would not be apt to withhold a clarification in the light of a

8

concrete situation that left parties . . . in the dark as to their duty toward the court." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 15 (1945). "By clarifying the scope of a previously issued injunction, a court 'add[s] certainty to an implicated party's effort to comply with the order and provide[s] fair warning as to what future conduct may be found contemptuous.'" *Smagin*, 2020 WL 1652347, at *3 (quoting *N.A. Sales Co., Inc. v. Chapman Indus. Corp.*, 736 F.2d 854, 858 (2d Cir. 1984)). Clarification may thus prevent enjoined conduct from occurring at all, thereby obviating the need for a court to adjudicate contempt proceedings.

## ARGUMENT

**I.     HB 509 Violates this Court's 2018 Ruling and the Permanent Injunction.**

HB 509 reinstates a categorical ban on transgender people correcting their birth certificates for the purpose of matching their gender identity, which is in direct violation of this Court's order declaring such a ban unconstitutional and permanently enjoining its enforcement. Given Defendants' disagreement, however, Plaintiffs respectfully request that this Court grant clarification confirming that HB 509 is already enjoined by this Court's permanent injunction. Courts often grant clarification where, as here, a concrete dispute has arisen between the parties regarding the scope of an existing injunction. *See, e.g., Smagin*, 2020 WL 1652347, at *4 (confirming scope of injunction as to third parties acting in concert with defendant); *Zeetogroup, LLC v. Fiorentino*, No. 19-458, 2020 WL 886866, at *2-3 (S.D. Cal. Feb. 24, 2020) (clarifying what business conduct would within scope of injunction); *Abdi v. Nielsen*, 287 F. Supp. 3d 327, 333-39 (W.D.N.Y. 2018) (clarifying affirmative requirements of injunction); *Commodores Entm't Corp. v. McClary*, No. 14-1335, 2016 WL 7366948, at *3 (M.D. Fla. Nov. 15, 2016) (clarifying whether modified band names fell within scope of injunction regarding trademarks).

To begin, this Court held that a categorical ban such as HB 509 is unconstitutional. The

9

challenged conduct giving rise to this litigation was that the government "categorically and automatically denies applications to change the listed sex" by transgender people seeking congruence with their gender identity. *F.V.*, 286 F. Supp. 3d at 1134; *accord id.* at 1141 ("IDHW practices a policy of automatically and categorically denying applications made by transgender people to amend the birth-assigned sex on their birth certificates to align with their gender identity."). In response, this Court conclusively determined that Defendants "violate the Equal Protection Clause by failing to provide an avenue for transgender people to amend the sex listed on their birth certificates." *Id.* at 1145. Indeed, this Court went on to hold that "there is no rational basis for denying transgender individuals birth certificates that reflect their gender identity." *Id.* at 1142.

The plain language of HB 509, however, reinstates a categorical ban. As before this Court's ruling, there would, once again, be no avenue for transgender people to change their birth certificates "on the basis of correcting it to match one's gender identity." *Id.* at 1141. That is the intended result of defining "sex" as "specifically" one's sex chromosomes and reproductive anatomy at birth. HB 509, § 2(3). A person is defined as transgender precisely because their gender identity does not match their birth-assigned sex, which is generally made "based on the observation of external genitalia" at birth—the "biological and physiological characteristics" that HB 509 uses to define sex. *F.V.*, 286 F. Supp. 3d at 1136; HB 509, § 2(3).

Legislative proceedings confirm that HB 509 imposes a categorical ban and is in direct violation of this Court's injunction. As discussed above, HB 509 was enacted to defy this Court's ruling and permanent injunction. *Supra* at 7-8. Lawmakers' defense of *why* they believed it was appropriate to ban transgender people from correcting their birth certificates to match their gender identity confirms that HB 509 reinstates such a ban. For example, when

10

asked "So, should this legislation go in place, will it prevent transgender folks from being able to change their gender marker on their birth certificate," Rep. Young responded with why she felt that such a ban was appropriate: "The birth certificate does not say gender. It says sex. And what I am arguing is that sex should be, as it has been historically, a legal and scientific term related to biology." Feb. 21, 2020 House State Affairs Comm. at 43:30-44:00. Indeed, lawmakers' disapproval of birth certificate corrections based on what they dismissed as "subjective feelings" was on display in the bill itself. HB 509, § 1(2)(h).

While HB 509 does not bar gender marker corrections by people *who are not transgender*—for example, to fix a typographical error, which was already permitted even before this Court's ruling, *F.V.*, 286 F. Supp. 3d at 1134—that does not change that it imposes a categorical bar for transgender people.[5] By analogy, this Court recognized that laws excluding same-sex couples from marrying plainly banned lesbian and gay people from marriage—notwithstanding that they could marry different-sex partners. *Latta v. Otter*, 19 F. Supp. 3d 1054, 1072 (D. Idaho 2014) ("man-woman marriage is no answer" for lesbian and gay couples); *see also City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451 (2015) ("The proper focus of the constitutional inquiry is the group for whom the law is a restriction.") (internal quotes omitted).

The injunctive and declaratory relief ordered by this Court already bars enforcement of HB 509. First, as explained above, complying with HB 509 would be "practicing or enforcing the policy of automatically rejecting applications from transgender people to change the sex listed on their birth certificates," in violation of the permanent injunction. *F.V.*, 286 F. Supp. 3d

---

[5] The same is true with respect to HB 509's subsection regarding "a physiological disorder of sexual development" in which an individual "cannot be recognized at birth as male or female based upon externally observable reproductive anatomy." HB 509, § 2(5). That provision also does not permit transgender people to correct the gender markers on their birth certificates for the purpose of matching their gender identity.

11

at 1146.  Indeed, given that Defendants previously believed that this practice was required by Idaho law, *id.* at 1134, HB 509 simply supplies another statutory directive that the practice must continue.  Second, HB 509 flouts this Court's mandatory injunction for Defendants to "accept[]" applications from transgender people seeking to correct their birth certificates to match their gender identity.  *Id.* at 1146.  No such applications can be "accepted" under HB 509 in any meaningful sense.  Third, HB 509 violates this Court's order that "any" rule implemented by the government "must not" disclose a transgender individual's birth-assigned sex "to avoid impermissibly compelling speech and furthering the harms at issue."  *Id.* at 1135 (explaining why revision history must not appear on amended birth certificate).  In sum, HB 509 returns Idaho to a regime in which transgender people are permanently saddled with identity documents discordant with their gender identity, exposing them to a lifetime of heightened risk for harm.

The fact that HB 509 was enacted after this Court's ruling does not remove the law from the scope of the injunction.  In *One Wisconsin Institute v. Thomsen*, 351 F. Supp. 3d 1160 (W.D. Wisc. 2019), the district court issued an injunction in 2016 against Wisconsin's restrictions on early voting—enjoining "[t]he state-imposed limits on the time for in-person absentee voting"—but Wisconsin then enacted a new statute on early voting (Act 369) in 2018.  *Id.* at 1161.  The government argued that the "injunction was directed at specific laws in effect at the time and that Act 369 is a new law, so it falls outside the scope of the injunction."  *Id.* at 1161-62.  The court rejected that argument because "the scope of the injunction relates to conduct that the court concluded was unlawful" rather than merely to "particular statutory provisions."  *Id.* at 1162.  "If the court accepted defendants' argument, it would mean that a legislative body could evade an injunction simply by reenacting an identical law and giving it a new number."  *Id.*

Similarly, this Court enjoined enforcement of a policy that was defined by the *conduct* of

12

"automatically rejecting applications from transgender people to change the sex listed on their birth certificates," and that same conduct is now required by HB 509. *F.V.*, 286 F. Supp. 3d at 1146. In fact, far from being limited to any particular iteration of a policy, both sides stipulated that "[o]n March 5, 2018, the Court . . . permanently enjoined Defendants from automatically rejecting applications from transgender people to change the sex listed on their birth certificates." Dkt. 42 at 2. The facts here are even more egregious than in *One Wisconsin*, where the state had attempted to eliminate some of the restrictions on early voting that the court had found unlawful. 351 F. Supp. 3d at 1162 (rejecting that these alterations changed the applicability of the injunction, because "[a] party cannot avoid an injunction by complying with parts of it while disregarding others"). Here, Idaho has doubled down on a categorical ban as to transgender people, which is exactly what this Court struck down. "Regardless why the state legislature enacted the law, all the provisions at issue are encompassed by the injunctions and are therefore enjoined." *Id.* at 1161

**II.     Any Relief From the Permanent Injunction Would Require a Motion to Dissolve.**

Defendants cannot unilaterally decide that the permanent injunction no longer applies. If Defendants believe that there are sufficient grounds to justify dissolving the permanent injunction—which do not exist here—they can file a motion seeking dissolution from this Court; but what they cannot do is arrogate that power to themselves. *See* Fed. R. Civ. P. 60(b)(5) (permitting relief where applying judgment prospectively is no longer equitable). For example, government officials have attempted to dissolve injunctions on the grounds that there has been a "significant change" in facts based on remedial measures that supposedly cure a constitutional violation. *E.g.*, *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000) (affirming denial of dissolution where government had made "some progress" but still needed to take "further steps

to bring a constitutionally adequate program into reality"). Here, of course, HB 509 does not cure—but rather reinstates—the constitutional violation, and Defendants cannot overcome other insurmountable barriers to dissolve the injunction. In any event, no such motion is before this Court.

## CONCLUSION

In holding that government discrimination against transgender people requires heightened scrutiny, this Court recognized that transgender people have suffered a history of persecution and discrimination that "'is not yet history.'" *F.V.*, 286 F. Supp. 3d at 1131 (quoting *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015)). HB 509 itself confirms that sobering reality. But that reality was also part of the reason why this Court *permanently* enjoined Defendants from returning to a categorical ban. Plaintiffs therefore request that this Court grant their motion for clarification and hold that the permanent injunctive and declaratory relief ordered on March 5, 2018 already bars any enforcement of HB 509's prohibition against gender marker corrections sought by transgender people in order to match their gender identity and continues to require Defendants to accept applications for such corrections.

DATED: April 16, 2020            By:    /s/ Monica G. Cockerille

Monica G. Cockerille (ISB No. 5532)
monica@cockerillelaw.com
Cockerille Law Office, PLLC
100 W. Main St., Ste. 204
Boise, ID 83702
Tel: (208) 343-7676 | Fax: (866) 226-2499

Peter C. Renn (Admitted *Pro Hac Vice*)
prenn@lambdalegal.org
Nora Huppert (Pending Admission *Pro Hac Vice*)
nhuppert@lambdalegal.org
Lambda Legal Defense and Education Fund, Inc.
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010

Tel: (213) 382-7600 | Fax: (213) 351-6050

Kara N. Ingelhart (Admitted *Pro Hac Vice*)
kingelhart@lambdalegal.org
Lambda Legal Defense and Education Fund, Inc.
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
Tel: (312) 663-4413 | Fax: (312) 663-4307