LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB # 3586
DAYTON P. REED, ISB # 10775
Deputy Attorneys General
Civil Litigation Division
Office of the Attorney General
954 W. Jefferson Street, 2nd Floor
P. O. Box 83720
Boise, ID  83720-0010
Telephone:  (208) 334-2400
Fax:  (208) 854-8073
steven.olsen@ag.idaho.gov
dayton.reed@ag,idaho.gov

Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| F.V. and DANI MARTIN,<br><br>                              Plaintiffs,<br><br>vs.<br><br>DAVID JEPPESEN, in his official capacity as Director of the Idaho Department of Health and Welfare and ELKE SHAW-TULLOCH, in her official capacity as Administrator of the Division of Public Health the Idaho Department of Health and Welfare, and JAMES AYDELOTTE, in his official capacity as State Registrar and Chief of the Bureau of Vital Records and Health Statistics,<br><br>                              Defendants. | Case No. 1:17-cv-000170-CWD<br><br>**OPPOSITION TO PLAINTIFFS' MOTION FOR CLARIFICATION OF MARCH 5, 2018 ORDER (Dkt. 46)** |

## INTRODUCTION

Plaintiffs ask the Court to issue an advisory opinion prejudging House Bill 509[1] months before it even becomes effective. And even when the law becomes effective, Plaintiffs will not

---

[1] 65th Leg. (2020) (to be codified at Idaho Code §§ 39-240, 39-245A, and 39-279), text available at: https://legislature.idaho.gov/wp-content/uploads/sessioninfo/2020/legislation/H0509.pdf

OPPOSITION TO PLAINTIFFS' MOTION FOR CLARIFICATION
OF MARCH 5, 2018 ORDER (Dkt. 46) - 1

have standing to challenge it. The law cannot injure them, because the Court's injunction fully remedied their harm. In essence, Plaintiffs seek an order to prevent hypothetical harm to unknown persons in the future once House Bill 509 ("HB 509") becomes effective. The Court should reject this extraordinary request to ignore jurisdictional limits and deny Plaintiffs' motion.

Further, Plaintiffs improperly ask the Court to go outside the four corners of its injunction. The *Judgment* [Dkt. 43] was not a categorical ban on all actions by all State actors, in perpetuity, that would regulate amendments to birth certificates—it was a remedy, enforceable against specific Defendants, to redress harm caused by a specific policy. Couching their request as a motion for clarification, Plaintiffs wish to stretch the Court's injunction to cover a potential claim of unconstitutionality against a statute that was not in existence then—and which is still not in effect today. A challenge to the constitutionality of HB 509 was not ripe when the *Judgment* issued and is not ripe now. The Court should decline to issue such a "clarification" because the scope of the injunction must be discerned within its four corners, not by reference to what might satisfy Plaintiffs' purposes. *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, No. C11-2043JLR, 2017 WL 1057644, at *2 (W.D. Wash. Mar. 17, 2017) (quoting *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971)). Injunctive relief "must be tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (citations omitted).

Finally, HB 509 is entitled to a presumption of constitutionality which cannot be rebutted until a proper complaint is filed challenging the statute.

**BACKGROUND**

Prior to the Court's March 5, 2018 *Memorandum Decision and Order (Dkt. 28)* [Dkt. 39] ("2018 Order"), the Idaho Department of Health and Welfare's Bureau of Vital Records and Health Statistics ("Bureau") had a policy of refusing to process applications from transgender persons requesting that the "sex" designated on their birth certificate be changed. The Bureau interpreted Idaho law in effect at the time to prohibit such changes.

Idaho Code § 39-250 provided that birth certificates can be amended "only in accordance with this chapter and rules promulgated by the board." No statute or rule specifically permitted amendment of the designated sex on a birth certificate. Idaho Code § 39-250(1) required that an amended certificate must be marked "amended," except as specifically provided by statute. IDAPA 16.02.08.201.08.a (2017) provided that in case of an amendment, except where specifically provided otherwise by law, the item number of the entry that was amended must be identified, IDAPA 16.02.08.201.08.a.i (2017); and the amendment must be made by drawing a line through the old information, without obliterating it, and inserting the new information in an adjacent space. IDAPA 16.02.08.201.08.a.iii (2017).

Defendants previously admitted that they were "aware of no rational basis justifying a prohibition against changing the sex designation on the birth certificate of a transgender person who has undergone clinically appropriate treatment to permanently change his or her sex." (Dkt. 23 ¶ 5.) Defendants made this concession because they were aware of no legislative purpose or policy behind such a prohibition. They merely interpreted existing law to prohibit changing the sex designation because no law specifically authorized it.

In its 2018 Order, the Court went further than Defendants' concession that they were aware of no rational basis supporting their policy. The Court ruled that Defendants' policy in

effect at the time—of automatically rejecting transgender persons' applications to change the "sex" designation on their birth certificates in a confidential manner—was subject to heightened scrutiny. *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1135 (D. Idaho 2018). The Court held that the policy violated the Equal Protection Clause. *Id.* at 1145. Consequently, the Court permanently enjoined Defendants "from practicing or enforcing *the policy* of automatically rejecting applications from transgender people to change the sex listed on their birth certificates." *Id.* at 1146 (emphasis added); Dkt. 43 ¶ 3 (emphasis added).

In the time between the Court's 2018 Order and the *Judgment* [Dkt. 43], the Idaho Department of Health and Welfare ("IDHW") adopted a temporary rule specifically addressing in law, for the first time, amendments to the "sex" indicator on birth certificates. IDAPA 16.02.08.201.06 (2018). With this rule, the challenged policy was extinguished. A policy of automatically denying transgender individuals' applications, based on law that was silent as to changes to the "sex" indicator on a birth certificate, could not coexist with new rules explicitly allowing for changes to "sex" on one's birth certificate. As required in the Court's order, Defendants abandoned the challenged policy in favor of a rule under which applications are "reviewed and considered through a constitutionally-sound approval process," and under which amendments are not noted on the new birth certificate. Dkt. 43 ¶ 4.

The rule as promulgated remains substantially the same to the present time. Defendants accept and process requests to change the sex indicator on birth certificates as provided by IDAPA 16.02.08.201.06 (2020). Defendants have not reintroduced the policy this Court found to be unconstitutional, nor have they adopted any similar policy or practice. Defendants have maintained strict compliance with the *Judgment*.

On March 18, 2020, the Legislature passed—and on March 30, 2020 the Governor signed into law—HB 509, which provides that the sex marker on a birth certificate, along with other "quantitative statistics and material facts," may only be amended in two situations. HB 509 § 2 (to be codified at Idaho Code § 39-245A(2)). First, the sex marker may be amended within the first year if a mistake was made on the original and the medical professional who provided the information attests to the mistake. *Id.* (to be codified at Idaho Code § 39-245A(4)). Second, it may be amended after one year by court order on the basis of fraud, duress, or material mistake of fact. *Id.* This statute goes into effect July 1, 2020. *See* 2020 Enacted Legislation, available at: https://legislature.idaho.gov/sessioninfo/2020/law/. The statute applies to all individuals and all birth certificates. The purpose is to further the State's "compelling interest in maintaining accurate, quantitative, biology-based material facts on Idaho certificates of birth that provide material facts fundamental to the performance of government functions that secure the public health and safety." HB 509 § 2 (to be codified at Idaho Code § 39-245A(1)(a)(ix)). The statute is drafted to avoid "the conflation of sex and gender" in vital statistics, to mitigate the risk of unintended medical harm, and to aid medical research. *Id*. (to be codified at Idaho Code § 39-245A(1)(a)(iv).[2]

---

[2] Plaintiffs' *Memorandum of Law in Support of Motion for Clarification of March 5, 2018 Order* [Dkt. 46-1] attempts to characterize the motivations of legislators in an effort to persuade the Court to strike HB 509 under the guise of the injunction in this case. Dkt. 46-1 at 7-8. However, neither legislators' statements nor their alleged motivations can change the requirement that a statute's constitutionality may only be decided in the context of an actual case or controversy. *See United States v. O'Brien*, 391 U.S. 367, 383-84 (1968) ("It is a familiar principal of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive. . . . Inquiries into congressional motives or purposes are a hazardous matter. . . . What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." (Footnote omitted.)); *see also Palmer v. Thompson*, 403 U.S. 217, 224-25 (1971) ("[T]here is an element of futility in a judicial attempt to invalidate a law because of the bad motives of its supporters. If the law is struck down for this

When HB 509 goes into effect, it will supersede IDAPA 16.02.08.201.06 (2020), which in turn superseded the policy that motivated this lawsuit and which this Court found unconstitutional—the policy the *Judgment* specifically targets and prohibits.

## ARGUMENT

**A.    This Court Should Reject Plaintiffs' Efforts to Use Its Injunction to Address Issues That are Not Ripe and for Which They Have No Standing.**

Plaintiffs urge the Court to expand the scope of the injunction to cover non-justiciable issues, including issues that are not yet ripe and relief for which Plaintiffs have no standing to seek.  Asking the Court to declare that its injunction applies to HB 509 is asking the Court to decide the law's constitutionality outside of a case or controversy.  But the case-or-controversy requirement is jurisdictional, and both ripeness and standing are necessary components. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342, 352 (2006).  The case-or-controversy limitation is essential to the constitutional separation of powers undergirding our system of government.  *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 663 (1993); *Flast v. Cohen*, 392 U.S. 83, 95 (1968) (explaining that the words "cases" and "controversies" "define the role assigned to the judiciary in the tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government."); *cf. New Orleans Water Works Co. v. City of New Orleans*, 164 U.S. 471, 481 (1896) ("[A] court of equity cannot properly interfere with, *or in advance restrain*, the discretion of a municipal body while it is in the exercise of powers that are *legislative* in their character." (Emphasis added.)).

---

reason, rather than because of its facial content or effect, it would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons.").

This Court recognized that it could not rule as to future actions, such as new administrative rules, explaining, "[b]ecause the Court does not have a proposed rule before it, it will not extrapolate on the potential legal ramifications of such restrictions—such topics are not ripe for its consideration." *F.V.*, 286 F. Supp. 3d at 1141. If this sentiment applied to future administrative rules promulgated by IDHW, it applies with greater force to future legislation passed by a completely different governmental body.

Ripeness requires a controversy that is definite and concrete, as opposed to hypothetical or abstract. *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010) (citation omitted). When the Court issued its *Judgment*, there was no definite and concrete controversy regarding a statute that did not yet exist—and which even now is not yet in effect—and therefore a challenge to HB 509 could not have been ripe, and this Court could not have issued an order preemptively invalidating it.

Further, this Court cannot issue an injunction providing Plaintiffs relief for which they do not have standing to seek. Standing ensures that legal questions will be resolved "not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). Standing requires that the plaintiff suffer an injury in fact; that there be a causal connection between the injury and the complained-of conduct; and that it is likely that the injury can be redressed by a favorable court decision. *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 946-47 (9th Cir. 2002) (citations omitted). Standing is jurisdictional at each stage of litigation. *Id.* at 947. If Plaintiffs had no standing to seek a certain remedy, then the Court was without jurisdiction to provide it.

By filing this lawsuit, Plaintiffs sought relief from a policy that denied them the ability to apply for a change to their birth certificates. This Court provided the remedy they sought: as a consequence of the injunction, Defendants no longer employed the policy of automatically denying applications. Plaintiffs had full opportunity to make use of the new procedures established to allow them to change their birth certificates. And they had full opportunity to seek redress if Defendants were not complying with the injunction in a way that allowed them to apply for the desired change.

In light of the relief the injunction afforded to Plaintiffs, HB 509 does not cause them an injury. In fact, HB 509 does not currently prevent any Idahoan from seeking a change to a birth certificate under IDAPA 16.02.08.201.06. No potential plaintiff could argue that it prevents them from changing their birth certificate until it becomes effective in July. From the time IDHW abandoned the challenged policy in 2018 as a result of the Court's injunction until the effective date of HB 509 in July 2020, there has been and cannot be a bona fide case or controversy. Therefore, the injunction could not have extended to HB 509, and neither Plaintiffs nor any other person has standing to challenge that law, which has not yet gone into effect.

**B.      The Plain Language of the Injunction Applies Only to the Policy in Effect at the Time the Injunction was Entered.**

Defendants agree that the Court has discretion to clarify the scope of its injunction. However, the scope of the injunction must be discerned from its four corners. *Inst. of Cetacean Research*, 2017 WL 1057644, at *2 (quoting *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971)). The *Judgment* does not enjoin the Idaho Legislature from passing legislation to regulate amendments to birth certificates, nor does it enjoin the Governor from signing a statute into law. The injunction applies only to "Defendants and their officers, employees, and agents" and it

enjoins only "*the policy* of automatically rejecting applications from transgender people to change the sex listed on their birth certificates." Dkt. 43 ¶ 3 (emphasis added).

The *Judgment* requires that "[s]uch applications must be reviewed and considered through a constitutionally sound approval process[.]" *Id.* ¶ 4. The order does not purport to apply to any future administrative rule or legislation. This Court recognized in its 2018 Order that such issues were not yet ripe. *F.V.*, 286 F. Supp. at 1141. Paragraph 4, read in the context of the entire *Judgment*, applies only to "the policy" found unconstitutional in paragraph 2—the "policy" Defendants were enjoined from practicing or enforcing in paragraph 3. Nowhere within the four corners of the injunction does it indicate that its scope goes beyond Defendants' policy and would be applicable to new legislation.

Judge Posner highlighted this four-corners principle in *Shepard v. Madigan*, 734 F.3d 748 (7th Cir. 2013). After the Seventh Circuit Court of Appeals declared an Illinois gun control statute unconstitutional, it allowed Illinois 210 days to pass new legislation to replace it. *Id.* at 749. The replacement statute provided for an additional 270-day delay in allowing the plaintiffs to receive the permits to carry firearms to which they were entitled. *Id.* at 749-50. The plaintiffs sought further relief from the court, aggrieved that the statute passed to replace the unconstitutional statute further deprived them of the very constitutional rights vindicated by the court's order. *Id.* at 750.

Judge Posner explained that the court could not address concerns regarding the new statute without a new lawsuit to challenge it, even when the new statute, necessitated by the Court's order, clearly infringed upon the same rights that the previous statute had:

> [Plaintiffs'] gripe—the basis for the interim relief they're seeking—is that the state is dragging its heels in bringing its new, concealed-carry law into line with our ruling. But to challenge this foot dragging, or anything else that they don't like about the new law, the plaintiffs must file a new lawsuit challenging the new law

OPPOSITION TO PLAINTIFFS' MOTION FOR CLARIFICATION
OF MARCH 5, 2018 ORDER (Dkt. 46) - 9

or the schedule for its implementation, and seek a preliminary injunction. . . . The appeal before us is not from a ruling in a new lawsuit. It is from the district court's refusal to rule that until the new law becomes fully operational (on the 270th day after July 9 of this year), the Second Amendment entitles all Illinois residents who have a valid FOID card to carry a gun outside the home.

> That ruling by the district court would be actionable without a new lawsuit only if it violated our mandate. We remanded for the entry of declaratory and injunctive relief against the old law, but fixed no timetable for the implementation of a superseding law. Our opinion contains no explicit or implicit directive to make declaratory or injunctive relief against the operation of the old law immediate, without awaiting the enactment, let alone the implementation, of a new law—thus creating a regulatory gap. . . .
>
> . . . We said that the state could create a new law with reasonable restrictions. We did not specify them—that would have been premature. . . . We do not say that these [new] restrictions are permissible; that issue is not before us. We say only that our mandate did not forbid the state to impose greater restrictions on carrying a gun outside the home than existing Illinois law (in this respect materially unchanged by the Firearms Concealed Carry Act) imposes on possessing a gun in the home. . . .
>
> . . . [W]hile our mandate set a deadline for the enactment of a statute that would replace the statute that we were invalidating, we neither set a deadline for full implementation of the replacement statute by the grant of concealed-carry licenses to qualified applicants under the new statute nor prescribed a regulatory regime for the interim period. Deciding those matters was therefore left to the State of Illinois in the first instance. What the state has done about the interim regime for concealed carry may be good or bad, constitutional or unconstitutional, but it is not a violation of our mandate.
>
> We do not mean to belittle the plaintiffs' complaint about delays built into the new law. But if they don't like the new law, and wish to invalidate it, they must bring a new suit. Their only basis for complaining about the district court's refusal to enjoin the old law immediately—and thus allow them (if they have a FOID card) to start carrying guns in public without complying with the new law—is that we ordered it and therefore the district court has violated our order. That is incorrect. We made no order regarding relief except to specify a deadline for the state to enact a new law. It met the deadline. Thus the district court did not violate our mandate and so there is no basis for the relief that the plaintiffs sought.

*Id.* at 751-52.

The court in *Shepard* recognized it could not extend its prior order beyond what it

mandated.  It also recognized that it was legally improper to rule on the constitutionality of a

OPPOSITION TO PLAINTIFFS' MOTION FOR CLARIFICATION
OF MARCH 5, 2018 ORDER (Dkt. 46) - 10

statute unless a complaint had been filed challenging its constitutionality. However, in the present case, Plaintiffs ask this Court to do exactly that: to extend its injunction beyond its four corners and determine the constitutionality of a newly passed statute without Plaintiffs filing a new complaint. However, the scope of the injunction does not extend farther than its four corners. It applies only to Defendants' former policy, not to HB 509.

The case upon which Plaintiffs rely, *One Wisconsin Institute, Inc. v. Thomsen*, 351 F. Supp. 3d 1160 (W.D. Wis. 2019), is distinguishable. In *Thomsen*, the court enjoined "state-imposed limits on the time for in-person absentee voting" and then applied that injunction to a new law that made what the court concluded was immaterial changes to the old law. *Id.* at 1161, 1162. The Wisconsin law, though, was one that could cause recurring harm, because it dealt with absentee ballot procedures. The plaintiffs harmed by the first challenged law could be harmed again by a new law in a subsequent election. The present case is fundamentally different. This Court's injunction completely remedied Plaintiffs' asserted injury by allowing them to change their birth certificates, which they presumably did. HB 509 does not harm them and consequently they do not have standing to assert that the injunction in this case should extend to the new law.

In addition to Plaintiffs' lack of standing to challenge HB 509, the new law is fundamentally and materially different from the challenged policy—the two cannot be packaged together as one and the same. First, and most obviously, the policy the *Judgment* enjoined was a practice created by Defendants, who operate in the executive branch of State government, while HB 509 is a statute passed by the Legislature, a completely separate branch of government. The actions of two separate branches of government cannot be summarily equated—each branch operates independently with separate duties and constraints. *See Regal Knitwear Co. v. N.L.R.B.*,

324 U.S. 9, 13 (1945) (citations omitted) ("The courts, nevertheless, may not grant an enforcement order or injunction so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law.").

Second, while the policy the *Judgment* enjoined reflected Defendants' efforts to apply law that did not specifically address changing the sex indicator on a birth certificate, HB 509 sets forth the underlying law going forward, and it is a result of a deliberative political process by the directly-elected representatives of the citizens of Idaho.

To stretch the injunction to cover future legislation like HB 509 would be to interfere with the legislative process without establishing justiciability and jurisdiction, and without so much as taking evidence on whether the new statute is constitutional. Further, this legislation was signed into law years after the *Judgment* issued, meaning that Plaintiffs are asking the Court to interpret its order to cover *future* legislation. The implication of such an interpretation is that the Legislature would perpetually be required to do its work under the supervision of the Court, which would essentially hold a veto power over legislation by means of its contempt powers.

**C.    HB 509 is Entitled to the Presumption of Constitutionality Unless it is Invalidated Through a Full Adjudication.**

By asking this Court to rule that its injunction applies to HB 509, Plaintiffs are asking the Court to invalidate the Bill without the opportunity to fully adjudicate the question of its constitutionality. *See* Dkt. 46-2 at 9 ("Clarification may thus prevent enjoined conduct from occurring at all, thereby obviating the need for a court to adjudicate contempt proceedings."). However, "State statutes, like federal ones, are entitled to the presumption of constitutionality until their invalidity is judicially declared." *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 153 (1944); *accord State v. Reed*, 686 P.2d 842, 844 (Idaho Ct. App. 1984).

Following this principle, the Ohio Supreme Court in *City of Toledo v. State*, 110 N.E.3d 1257 (Ohio 2018), held that the plaintiff would need to file a new lawsuit in order to challenge a statute passed in seeming defiance of a court order invalidating a different statute.  After an Ohio court declared as unconstitutional several portions of a statute regulating the use of traffic cameras by local governments, the Ohio General Assembly passed a bill predicating funding to municipalities on their compliance with the unconstitutional provisions.  *Id.* at 1260.  The plaintiff argued that

> the General Assembly was bound by the injunction and violated the prohibition against enforcing the traffic-camera regulations by imposing an economic penalty on the municipalities that fail to comply with them. It contends that the city was not required to file a separate action to specifically challenge the constitutionality of H.B. 64, because the trial court had continuing jurisdiction to enforce the injunction and the new enactment incorporated statutes that the court had declared unconstitutional. . . . "Instead of enacting new legislation to replace the unconstitutional regulation of automated-traffic cameras, it doubled down, by passing legislation that enforces the existing laws."

*Id.* at 1262.  The court explained that a statute is entitled to a strong presumption of constitutionality, and the plaintiff bears the burden to prove its unconstitutionality.  *Id.* at 1262-63.  The court explained further that a constitutional challenge requires the plaintiff to file a complaint to invoke the court's jurisdiction over the case.  *Id.* at 1263.  Because no complaint was filed, the court could not enjoin enforcement of the new statute.  *Id.* at 1263.

Just as is the case under Ohio law, a plaintiff in federal court must file a sufficient complaint before a federal court may exercise jurisdiction.  *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citations omitted) ("To invoke a federal court's subject-matter jurisdiction, a plaintiff needs to provide only 'a short and plain statement of the grounds for the court's jurisdiction.'  The plaintiff must allege facts, not mere legal conclusions, in compliance with the pleading standards established by *Bell Atlantic Corp. v. Twombly* . . . and *Ashcroft v.*

*Iqbal*[.]"); *P. K. Family Rest. v. IRS*, 535 F. Supp. 1223, 1224 (N.D. Ohio 1982) ("Absent a complaint, this Court lacks jurisdiction to entertain plaintiff's petition for injunctive relief."); *In re Mkt. Basket, Inc.*, 122 F. Supp. 321, 322 (W.D. Mo. 1954) (citation omitted) ("Until an action has been commenced in this court, obviously, it has no jurisdiction to act."); Fed. R. Civ. P. 3.

The present case shares similarities with *City of Toledo*, in that Plaintiffs argue that the Idaho Legislature passed HB 509 in defiance of the Court's injunction against Defendants. Despite this, as the Ohio Supreme Court persuasively explained, a statute is entitled to a presumption of constitutionality, and a complaint is required before a court can exercise jurisdiction over a challenge to that constitutionality. 110 N.E.3d at 1263.

This case goes farther than *City of Toledo*, however. The plaintiff in *City of Toledo* challenged a statute, which was declared unconstitutional and replaced with another questionable statute. *See id.* at 1260-61. In the present case, Plaintiffs challenged an Executive agency policy, which was abandoned and superseded by an administrative rule that completely remedied Plaintiffs' asserted injury. That rule will be superseded by HB 509, but not until July 2020. Unless and until that new law goes into effect, is challenged by a plaintiff with standing, and is adjudged by a court, HB 509 is entitled to a presumption of constitutionality.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to clarify should be denied.

Dated this 1st day of May, 2020.

        STATE OF IDAHO
        OFFICE OF THE ATTORNEY GENERAL

    By:   */s/ Steven L. Olsen*
        STEVEN L. OLSEN
        Deputy Attorney General

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on the 1st day of May, 2020, I electronically filed the foregoing with th**e Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following** Persons:

Monica G. Cockerille
monicacockerille@me.com

Kara N. Ingelhart
kingelhart@lambdalegal.org

Peter C. Renn
Prenn@lambdalegal.org

Nora Huppert
nhuppert@lambdalegal.org

                                            */s/ Steven L. Olsen*
                                            STEVEN L. OLSEN