Monica G. Cockerille (ISB No. 5532)
monica@cockerillelaw.com
Cockerille Law Office, PLLC
100 W. Main St., Ste. 204
Boise, ID 83702
Tel: (208) 343-7676 | Fax: (866) 226-2499

Peter C. Renn (Admitted *Pro Hac Vice*)
prenn@lambdalegal.org
Lambda Legal Defense and Education Fund, Inc.
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
Tel: (213) 382-7600 | Fax: (213) 351-6050

Kara N. Ingelhart (Admitted *Pro Hac Vice*)
kingelhart@lambdalegal.org
Nora Huppert† (Admitted *Pro Hac Vice*)
nhuppert@lambdalegal.org
Lambda Legal Defense and Education Fund, Inc.
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
Tel: (312) 663-4413 | Fax: (312) 663-4307
†*Admitted in CA, Pending Admission in IL*

Attorneys for Plaintiffs F.V. and Dani Martin

Colleen R. Smith (ISB No. 10023)
crsmith@hawleytroxell.com
Hawley Troxell Ennis & Hawley LLP
877 Main Street - Suite 1000
Boise, ID 83701
Tel: (208) 388-4873 | Fax: (208) 954-5278

D. Jean Veta (Admitted *Pro Hac Vice*)
jveta@cov.com
Henry Liu (Admitted *Pro Hac Vice*)
hliu@cov.com
William Isasi (Admitted *Pro Hac Vice*)
wisasi@cov.com
Covington & Burling LLP
One CityCenter
850 10th St NW
Washington, DC 20001
Tel: (202) 662-5294

Michael Lanosa (Admitted *Pro Hac Vice*)
mlanosa@cov.com
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Tel: (424) 332-4780

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| F.V. and DANI MARTIN, <br><br> *Plaintiffs*, <br><br> v. <br><br> DAVID JEPPESEN, in his official capacity as Director of the Idaho Department of Health and Welfare; ELKE SHAW-TULLOCH, in her official capacity as Administrator of the Division of Public Health for the Idaho Department of Health and Welfare; and JAMES AYDELOTTE, in his official capacity as State Registrar and Chief of the Bureau of Vital Records and Health Statistics, <br><br> *Defendants*. | No. 1:17-cv-00170-CWD <br><br> **DECLARATION OF PETER C. RENN IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES** |

# DECLARATION OF PETER C. RENN

I, Peter C. Renn, declare as follows:

1.      I am more than eighteen (18) years of age, have personal knowledge of the facts set forth herein, and am otherwise competent to testify to the matters set forth herein.

2.      I am Counsel with Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal"), and one of the attorneys for Plaintiffs.  I make this declaration in support of Plaintiffs' motion for attorneys' fees relating to legal work performed in 2020-21 and to provide the relevant factual and procedural context to support the reasonableness of the requested fees.

## I.      Summary of Relevant Experience and Qualifications

3.      I have represented Plaintiffs in this litigation from its inception, when the action was filed on April 18, 2017, through judgment on April 20, 2018.  I also represented Plaintiffs in the subsequent legal work that was performed beginning in March 2020, which is the subject of Plaintiffs' fee motion.  I directed and generally supervised the legal work performed for this litigation, including by the other Lambda Legal staff who have worked on this case.

4.      I have specialized exclusively in litigation concerning the civil rights of lesbian, gay, bisexual, and transgender (LGBT) people at Lambda Legal since 2010.  Lambda Legal is the nation's largest and oldest non-profit legal organization working to achieve full recognition of the civil rights of LGBT people, and I work in its Western Regional Office, which is based in Los Angeles, California.  I graduated *magna cum laude* from Harvard Law School in 2006, where I was an executive editor of the Harvard Civil Rights-Civil Liberties Law Review.  After law school, I clerked for the Honorable Lawrence Karlton in the United States District Court for the Eastern District of California.  I then practiced complex civil litigation at the law firm of Munger, Tolles & Olson in Los Angeles before joining Lambda Legal.  The litigation undertaken

by Lambda Legal is no less complex than the civil litigation that I practiced at the law firm, where my rate was more than $400 per hour in 2010 as an attorney with four years of experience.

5.     During my time at Lambda Legal, I have acquired specialized experience and knowledge litigating constitutional claims on behalf of transgender people, including equal protection claims, which I relied upon in representing Plaintiffs in this litigation.  Examples of the cases that I have litigated include the following:  *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) (counsel in challenge to ban on open military service by transgender people); *Carcaño v. McCrory*, 203 F. Supp. 3d 615 (M.D.N.C. 2016) (counsel in challenge to North Carolina laws discriminating against transgender people in access to public facilities); *Rosati v. Igbinoso*, 791 F.3d 1037 (9th Cir. 2015) (counsel on appeal for transgender prisoner denied access to gender-confirming surgical care).

## II.     Relevant Procedural History

### A.     Original Litigation from Complaint Through Final Judgment (2017-18)

6.     On April 18, 2017, Plaintiffs filed their complaint challenging Defendants' categorical refusal to permit transgender people to correct the sex listed on their birth certificates—also known as a gender marker—in order to match their gender identity.  Dkt. 1.

7.     Because Defendants conceded from the outset of the litigation in their answer that this categorical refusal was unconstitutional under the equal protection clause, Dkt. 23, the ensuing litigation was focused on the remaining issues in dispute.  That included the appropriate judicial remedy for the equal protection violation, the proper scope of any injunctive and declaratory relief, and, relatedly, the level of constitutional scrutiny that any remedial measure replacing the categorical bar would need to satisfy.  Even that more focused litigation nonetheless required several hundred attorney hours.

8.      On March 5, 2018, this Court granted Plaintiffs' motion for summary judgment. Dkt. 39.  Among other things, this Court held that discrimination against transgender people requires heightened scrutiny under equal protection and granted a permanent injunction enjoining Defendants and their agents from categorically denying applications by transgender people to change the sex listed on their birth certificates in order to match their gender identity.

9.      Plaintiffs' counsel were also actively involved when the Board of Health and Welfare considered and adopted proposed rules to comply with the Court's orders.

10.      On April 20, 2018, this Court issued a final judgment, which reaffirmed the terms of the permanent injunction, and directed the Clerk of the Court to close the case.  Dkt. 43.

11.      Pursuant to Rule 4 of the Federal Rules of Appellate Procedure, any notice of appeal would have needed to be filed within 30 days of the judgment or order being appealed. Defendants did not appeal.

**B.      Subsequent Litigation Following Idaho House Bill 509 (2020-Present)**

**1.      Enactment of HB 509**

12.      Plaintiffs and their counsel were unexpectedly thrust back into litigation nearly two years later—long after a never-appealed final judgment—when the State of Idaho chose to enact House Bill 509 ("HB 509") in 2020 in defiance of this Court's permanent injunction.  HB 509 passed by 53-16-1 in the Idaho House on February 27, 2020, and by 27-6-2 in the Idaho Senate on March 17, 2020, before the Governor signed it into law on March 30, 2020.

13.      HB 509 sought to reinstate a categorical ban against transgender people correcting their listed sex to match their gender identity on its effective date of July 1, 2020.  It did so by requiring transgender people to obtain a court order that was impossible for them to obtain by its own terms.  The law defined "sex" as "the immutable biological and physiological

characteristics, specifically the chromosomes and internal and external reproductive anatomy, genetically determined at conception and generally recognizable at birth, that define an individual as male or female."  Idaho Code § 39-245A(3).  Furthermore, a transgender person could only challenge the sex listed on their birth certificate on the basis of fraud, duress, or mistake of material fact.  Idaho Code § 39-245A(4).

14.     The highly unusual circumstances around HB 509's enactment have previously been documented in this litigation.  Dkt. 46-1 at 7-8.  In short, the State passed the law in order to defy this Court's injunction, as confirmed by legislative proceedings.  Dkt. 58 at 13 n.7.  For instance, the bill's sponsor described this Court's ruling as "the epitome of judicial activism" and vowed not to "cede" authority to the judiciary.  Dkt. 46-1 at 7.  Another legislator voted for the law because, in his view, "boys are boys, and girls are girls" and "no judge . . . is going to change that reality."  *Id.*  As this Court observed, lawmakers also pressed forward with the legislation even though the Governor had declared a state of emergency due to COVID-19, and it was enacted alongside another anti-transgender law, which barred transgender females from participating in women's sports at publicly sponsored schools.  *Id.* at 4 n.4.  During legislative proceedings, the Attorney General's office cautioned that attorneys' fees from litigation over HB 509 "could exceed one million dollars."[1]

### 2.     Plaintiffs' Retention of Counsel

15.     As a threshold matter, Plaintiffs had to secure legal representation for legal work relating to HB 509.  While that new legal work was intimately related to the legal representation of Plaintiffs in 2017-18, which was the necessary foundation for subsequent legal work, the legal

---

[1] Letter from Brian Kane, Assistant Chief Deputy, Idaho Attorney General, to John Gannon, Member, Idaho House of Representatives (Feb. 28, 2020), https://www.boisestatepublicradio.org/sites/idaho/files/202002/doc_feb_28__2020__13_50.pdf.

work concerning HB 509 extended beyond the original representation.

16.     Given that Plaintiffs' counsel obtained the very injunction and judgment that Plaintiffs sought to show would be violated by HB 509's enforcement, it was reasonable to again retain Plaintiffs' counsel for legal work relating to HB 509.  Indeed, it would have been ill-advised, risky, and inefficient to proceed without prior counsel who had handled the relevant issues, because the potentially dispositive question was whether enforcement of HB 509 fell within the scope of the rulings that such counsel had litigated and obtained in 2017-18.  To handle the litigation properly, counsel needed not only expertise with respect to litigating constitutional discrimination claims on behalf of transgender people but, more specifically, expertise with respect to the prior litigation itself.  Even with respect to the former consideration, I am unaware of Idaho counsel who had such expertise and who was available and not otherwise preoccupied to handle the time-sensitive needs of the litigation concerning HB 509.  Proceeding without prior counsel would have also risked significant delay in achieving expeditious relief given HB 509's effective date of July 1, 2020.

17.     Plaintiffs therefore once again retained the legal services of Lambda Legal and Cockerille Law Office, PLLC, which had represented them in the 2017-18 litigation.  Given the amount of legal work relating to HB 509 that could be reasonably anticipated, and its time-sensitive nature, Plaintiffs additionally retained Covington & Burling LLP ("Covington") as counsel.

### 3.     District Court Proceedings

18.     Plaintiffs' counsel were forced to move quickly and efficiently following the enactment of HB 509 on March 30, 2020, given the amount of legal work that was required under the circumstances, including to fully brief, argue, and obtain a favorable judicial ruling

relating to HB 509 before its effective date just three months later on July 1, 2020, particularly if multiple motions proved necessary.

19.     The legal work relating to HB 509 performed by Plaintiffs' counsel includes, but is not limited to, what was filed on the court's docket, as court filings often represent only a fraction of the work required to represent a client's interests in litigation.

20.     As one illustration, Plaintiffs' legal team devoted significant resources to investigating the facts and circumstances surrounding the law's passage and enactment.  That included collecting, reviewing, and analyzing all legislative proceedings, testimony, and documents relevant to HB 509 that could be reasonably obtained.  Plaintiffs obtained contemporaneous statements made by legislators, both within and outside legislative proceedings, showing that the legislation was a direct effort to defy this Court's ruling.  Plaintiffs also utilized public records requests in order to obtain approximately 12,253 pages of documents (spanning approximately 1,931 documents) relating to HB 509.

21.     On April 16, 2020, Plaintiffs filed a motion for clarification and, simultaneously, a motion to shorten time on briefing given HB 509's looming effective date.  Dkt. 46.  Plaintiffs' motion for clarification sought relief to confirm that Defendants' enforcement of HB 509 would violate this Court's permanent injunction—and it thus functioned as a dispositive motion insofar as HB 509 was concerned, as a loss could have foreclosed relief through this action.  The motion also explained that Defendants would need to file a motion to dissolve the injunction if they sought to enforce HB 509.  *See* Fed. R. Civ. P. 60(b)(5).  Defendants filed their opposition on May 1, 2020, raising a large number of procedural and substantive arguments in response.  Dkt. 53.  Notably, one such argument was their contention that the Court could not grant any relief until after HB 509's effective date.  Plaintiffs then filed their reply on May 11, 2020, responding

6

to each argument. Dkt. 54. This Court heard oral argument shortly thereafter, on May 19, 2020.

22.    On June 1, 2020, this Court granted Plaintiffs' motion in part. Dkt. 58. The Court confirmed that HB 509 was subject to the permanent injunction, rejecting Defendants' argument that the legislation was outside the scope of the injunction merely because it was enacted after the injunction was issued.  It also found that HB 509 was enacted "in response to and for the purpose of circumventing the Order and Judgment in this case," observing that the legislators' statements cited in Plaintiffs' motion "speak for themselves." *Id.* at 13 n.7. However, the Court had no way of knowing how Defendants would choose to act after receipt of its June 1st ruling. It thus refrained from addressing whether enforcement of HB 509 would violate the injunction because enforcement itself "may or may not occur" once Defendants had the benefit of its ruling, while nonetheless recognizing that it could "soon" be forced to address such issues depending on Defendants' choices. *Id.* at 14.

23.    Following the June 1st ruling, the parties met and conferred, and Defendants indicated that they nonetheless intended to enforce HB 509 on July 1st, without obtaining a further ruling. Dkt. 66-2. This was notwithstanding the Court's June 1st order, which had stated that when questions arise as to the scope of an injunction, "a party should seek clarification or modification . . . rather than risk disobedience and contempt." Dkt. 58 at 5 (quotes omitted).

24.    Plaintiffs were thus forced to file a further motion for clarification, this time regarding Defendants' enforcement plan, on June 22, 2020. Dkt. 66. As before, this motion was similarly dispositive in nature, as a loss would potentially terminate the ability to obtain relief through the case. Defendants filed their opposition on July 2, 2020, again raising an array of procedural and substantive arguments, and Plaintiffs filed their reply on July 7, 2020. Dkts. 70-71. This Court heard oral argument on July 22, 2020.

25.     On August 7, 2020, this Court granted Plaintiffs' motion.  Dkt. 75.  It confirmed that Defendants' enforcement of HB 509—including the requirement that transgender applicants procure a court order that the law made impossible for them to obtain—violated the injunction. *Id.* at 10 ("the statute is directly at odds with the clear intent and mandate of the Injunction").

26.     Following the Court's ruling, the parties conferred regarding Defendants' next steps.  On August 19, 2020, Defendants' counsel confirmed to Plaintiffs' counsel that they intended to take further action in district court and that they did not view the case as being over. Plaintiffs' counsel noted that they anticipated that they would need discovery.

27.     On December 9, 2020, the parties filed a joint stipulation, which stated that "Defendants anticipate filing a motion relating to HB 509 in January, 2021."  Dkt. 76 at 2.  The stipulation also noted Plaintiffs' anticipated need for discovery.  *Id.*  Ultimately, Defendants did not file the motion they had stated they would file.  With this Court's injunction and judgment intact, transgender people born in Idaho have continued to be able to correct their birth certificates in order to match their gender identity.

## III.    Attorneys' Fees Sought

### A.     2020-21 Hours Expended

28.     The time expended in 2020-21 by Plaintiffs' legal team is reflected in task-based time entries, attached as Exhibit B, which represents a compilation of such entries for each attorney or paralegal.  I have exercised billing judgment to ensure that the time for which fees are sought was reasonable and necessary under the circumstances.  As part of that process, I eliminated time that could be deemed unnecessary, duplicative, or excessive.  I have also discounted or entirely eliminated certain entries for which fees could appropriately be sought. The time entries contain a column for the time spent on a task, as well as a column for the time

billed, with the latter column incorporating any discount from the exercise of billing judgment

and thus reflecting the hours for which fees are sought.

29.     Plaintiffs have not sought fees for a variety of legal work.  For example, they have

not sought any fees for three senior Covington attorneys who worked this matter, as explained

further below.  Likewise, Plaintiffs have not sought fees for legislative work relating to HB 509

performed by the attorneys from Lambda Legal, even though that work was part of monitoring

and attempting to secure compliance with the injunction.  Plaintiffs also have not sought fees for

a range of other individuals who contributed to this litigation, from law clerks who spent

substantial amounts of time on legal research to other attorneys who were consulted on the

litigation.

### B.     Reasonableness of Time Expended in Litigation Concerning HB 509

30.     The legal work performed by Plaintiffs' counsel in 2020-21 was necessitated by

the enactment and enforcement of HB 509.  That work was integral to ensuring both the integrity

of this Court's injunction and the vindication of the rights of the transgender people protected by

it.  As detailed below, that work was justified on multiple grounds, whether viewed as

monitoring compliance with the injunction, remedying violations of the injunction, or preventing

nullification of the relief that Plaintiffs had obtained.  Any reasonably prudent counsel would

have undertaken this work to protect their clients' interests and to defend the judgment and

injunction, particularly given the government's aggressive enforcement and defense of HB 509

amidst the politically charged environment that motivated its enactment.  The excellent results

Plaintiffs ultimately obtained only further confirms the propriety of the work performed.

### *Complexity, Difficulty, and Time-Intensive Nature of Legal Work Performed*

31.     Plaintiffs' legal work involved significant legal complexity and difficulty from

both a substantive and procedural perspective, which demanded a commensurate investment of time.  This was not a garden-variety civil case by any stretch.  Nor was it even a more traditional federal lawsuit instituted after the enactment of a new state law, which itself can already present considerable legal complexity.  Rather, the legal work was precipitated by the highly unusual action of a state enacting a statute specifically in defiance of a permanent injunction.  That action not only necessitated resource-intensive litigation regarding the intent, effect, and scope of the new law but litigation regarding the relationship between the new law and prior court orders, as well as the judicial remedies available under evolving circumstances playing out in real time.

32.     There was no clear or defined path for how the litigation relating to HB 509 should unfold, which substantially increased the complexity and difficulty of the legal work required of Plaintiffs' counsel, and triggered the need to prepare multiple strategies in tandem.

33.     That is illustrated during the period after HB 509's enactment in March 2020 but before it took effect in July 2020, when the question of what relief Plaintiffs could and should seek, and how to obtain it, was complicated by several factors.  During that time, Defendants argued they had not yet taken any contemptuous action violating court rulings, simultaneously resisted timely disclosure of their enforcement plans, and raised various constitutional defenses including standing, justiciability, and ripeness.  Even pinpointing and proving what actions that Defendants intended to take—as a purely factual matter—regarding enforcement of HB 509 in the days shortly preceding the law's effective date was subject to time-consuming disputes.  *See, e.g.*, Dkt. 66-2.

34.     Furthermore, both before and even after this Court's clarification rulings in 2020 relating to HB 509, multiple streams of legal work were needed to prepare for a range of potential procedural pathways that the litigation could take.  As one illustration, Defendants

10

argued that Plaintiffs could not obtain any relief relating to HB 509 through motions for clarification.  Defendants instead maintained there would need to be a new complaint filed, identifying additional individuals harmed by the law, along with presumably a motion seeking appropriate relief.  Dkt. 53 at 1-2, 11.  Particularly while Plaintiffs' motions for clarifications remained pending, they had to simultaneously prepare next steps if those motions were denied, given the harms posed by HB 509 and its effective date of July 1, 2020.  That preparation included, for instance, the time-intensive task of identifying and interviewing additional individuals who would be harmed by the law's enforcement and would be willing to participate in the litigation, whether as additional plaintiffs or fact witnesses at a minimum.

35.     Similarly, even if and after Plaintiffs prevailed in obtaining judicial confirmation that Defendants' enforcement of HB 509 violated this Court's injunction, Defendants could file a motion to dissolve that injunction.  *See* Fed. R. Civ. P. 60(b).  That risk was expressly identified in Plaintiffs' first motion for clarification in April 2020.  Dkt. 46-1 at 13.  Indeed, following this Court's ruling on Plaintiffs' second motion for clarification, Defendants confirmed to Plaintiffs in August 2020 that they anticipated filing a further motion relating to HB 509, although they did not know its precise timing.  Defendants subsequently confirmed to the Court in a filing, Dkt. 76, that they anticipated they would file their motion in January 2021.  While Defendants ultimately chose not to do so, any reasonably prudent attorney would perform the work that Plaintiffs' counsel undertook in order to prepare for disputes that were identified from the outset of litigation and to be able to respond properly, including to the justifications claimed for HB 509. In my experience, preparation to oppose dissolution of an injunction can require a significant investment of time.

36.     Plaintiffs' preparation was critical with respect to any factual issues that would

require Plaintiffs to develop fact and expert witness testimony and to conduct affirmative discovery, particularly within whatever amount of time was ultimately allotted for opposing any motion (which, by default, is 21 days under the local rules).  No extension is ever guaranteed, and similar to when a party seeks more time to respond to a motion for summary judgment citing a need for further discovery, the court often considers whether the party has already exercised diligence in considering granting additional time.  Given the foreseeability of Defendants' motion, Plaintiffs reasonably undertook work analyzing the claimed justifications for HB 509 and developing the legal and factual responses to those claimed justifications.  Those justifications, which were laid out in HB 509's legislative findings section, related to wide-ranging subjects such as health research, sex-specific treatment in various contexts, the provision of health care, national security, law enforcement interests, and others.

37.     Thus, the time that Plaintiffs expended on motion practice itself—which was the functional equivalent to two dispositive motions and demanded a corresponding investment of time, given their significance to the litigation—represented only a fraction of the legal work required in this litigation.  The other, interrelated legal work described above was reasonably required as well, regardless of whether it ultimately resulted in additional motion practice.

### *Expedited and Time-Sensitive Nature of Litigation*

38.     Much of the legal work relating HB 509 had to be performed under significant time pressures because the harms of the law were imminent with an impending effective date of July 1, 2020.  In my experience, when legal work must be performed under such time pressures, any concerns about "excessive" time being spent on litigation tasks do not generally exist (and they did not exist here), for the simple reason that time is in short supply to perform even the essential litigation tasks required.

39.     For example, after HB 509 was signed by the Governor on March 30, 2020, Plaintiffs filed a motion seeking relief less than three weeks later on April 16, 2020, with the subsequent briefing on the motion shortened and oral argument heard shortly thereafter.  That required expedited legal work to determine what strategy and procedure to undertake, prepare the motion and accompanying factual and legal support, and analyze the entirety of the legislative history and testimony relating to the law.

40.     Similarly, after Defendants finally disclosed their intent to nonetheless proceed with enforcement of HB 509 shortly before its effective date, despite the Court having already issued an order confirming that the permanent injunction applied to the law, Plaintiffs had three calendar days (two falling over a weekend) in which to draft and file a further motion seeking additional relief.  Dkt. 66-2.  The subsequent briefing schedule was also shortened, with Plaintiffs having five calendar days (three over a holiday weekend) to file a reply.  Dkt. 69.

41.     The time constraints imposed by the litigation required Plaintiffs' counsel to utilize the staffing resources that were available at a given time to meet the demands of the moment.  Those time constraints also warranted scaling the staffing of the legal team commensurate to additional legal work that could be reasonably anticipated.  Without such staffing, it would not have been feasible to perform the range of legal work that was reasonably required across multiple fronts at the same time.

42.     Communication among the legal team was also critical, particularly during the months immediately after the law's enactment when there were constant developments relevant to the litigation on which team members needed to be apprised.  Periodic telephone conferences among the legal team were a necessary and efficient means of exchanging time-sensitive information, dividing labor, and monitoring the status of litigation tasks.

*Monitoring Compliance*

43.     Even after twice obtaining judicial relief through motions for clarification, Plaintiffs' counsel had to work to ensure and secure Defendants' compliance with the injunction. Plaintiffs first sought written confirmation of compliance immediately after the Court's August 7, 2020 order granting Plaintiffs' motion for clarification regarding Defendants' enforcement plan. Defendants provided that confirmation on August 11, 2020.

44.     In February 2021, Plaintiffs' counsel discovered that Defendants were again in violation of the Court's injunction. Specifically, Defendants' publicly posted website materials were again instructing applicants seeking to correct their birth certificates that they needed to submit a court order pursuant to Idaho Code § 39-245A, even though that was impossible for transgender people to obtain under HB 509. After Plaintiffs' counsel notified Defendants' counsel regarding this issue, which was apparently due to the wrong version of the instructions being posted on the website, Defendants took corrective measures to comply with the injunction.

**C.     Reasonableness of Hourly Rates Sought**

45.     Plaintiffs were represented by three firms in the 2020-21 litigation relating to HB 509: Lambda Legal, Cockerille Law Office, and Covington. One of Plaintiffs' attorneys, Colleen Smith, was an associate in the Washington D.C. office of Covington until March 2021, when she became an associate in the Boise, Idaho office of Hawley Troxell Ennis & Hawley.

**1.     Lambda Legal**

46.     Founded in 1973, Lambda Legal is the oldest and largest legal organization committed to achieving full recognition of the civil rights of LGBT people and everyone living with HIV through impact litigation, education, and public policy work.

47.     Lambda Legal is a 501(c)(3) non-profit organization that does not charge its

clients for legal services.  Neither it, nor any of Plaintiffs' counsel, charged Plaintiffs here for the legal services provided in this litigation.  Lambda Legal instead relies upon the recovery of attorneys' fees as part of its budget to sustain its operations.  The contingent nature of the representation here meant that Plaintiffs' counsel needed to invest hundreds of hours without any assurance of compensation.  That expenditure of time also necessarily precluded other work that would have been done in its place.

48.     Lambda Legal has been party counsel in several leading Supreme Court cases impacting the rights of LGBT people.  *See, e.g.*, *Obergefell v. Hodges*, 576 U.S. 644 (2015); *Lawrence v. Texas*, 539 U.S. 558 (2003); *Romer v. Evans*, 517 U.S. 620 (1996).  As here, Lambda Legal's impact litigation often involves novel or cutting-edge legal issues that require specialized knowledge and experience.  We recognize that when we undertake such litigation, the rights of many others in the LGBT community may be directly affected.  That is a responsibility we take seriously.

49.     Lambda Legal has significant litigation experience challenging government discrimination against transgender people across various contexts, with many of its cases establishing important precedent in the field.  *See, e.g.*, *Karnoski*, 926 F.3d at 1200 (holding, in case challenging ban on open military service by transgender people, that discrimination against transgender people requires heightened scrutiny under equal protection); *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) (holding, in case on behalf of transgender public employee, that discrimination against transgender people is sex discrimination).

50.     Lambda Legal has particular expertise in litigating the issue of identity documents, including on behalf of transgender people who were denied access to birth certificates matching their gender identity and sought to vindicate their federal constitutional

rights.  *See, e.g.*, *Ray v. McCloud*, 507 F. Supp. 3d 925 (S.D. Ohio 2020); *Foster v. Andersen*, No. 18-2552, Dkt. 33 (D. Kan. Jun. 21, 2019); *Gore v. Lee*, No. 19-328, Dkt. 1 (M.D. Tenn. Apr. 23, 2019); *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327 (D.P.R. 2018).  This expertise has created a base of institutional knowledge and experience that uniquely equips the organization's attorneys to deliver effective and efficient representation working as a team.

51.     Even at a national level, the pool of attorneys with experience litigating the issue of identity documents on behalf of transgender people, and the constitutionality of restrictions on correcting those documents, is very limited.  Lambda Legal has no offices or attorneys in Idaho.

52.     Lambda Legal took the lead role in representing Plaintiffs in this action from when it was first filed in 2017 through final judgment in 2018.  The overwhelming majority of the time spent in that period of litigation was expended by Lambda Legal.  Intimate familiarity with that period of litigation was a necessary (though not sufficient) foundation for successfully representing Plaintiffs in subsequent litigation relating to HB 509.  The critical question in that subsequent litigation was whether Defendants' enforcement of the law fell within the scope of the rulings that Plaintiffs previously obtained.  Indeed, the nature and scope of the injunction was specifically litigated in disputed summary judgment proceedings in 2017-18.

53.     Because Lambda Legal's earlier work in obtaining the permanent injunction made it uniquely positioned to represent Plaintiffs in litigation relating to HB 509, Plaintiffs have sought out-of-forum rates for the subset of their legal team from Lambda Legal.  The rates requested are justified by (and often lower than[2]) prevailing market rates in Los Angeles, California and Chicago, Illinois, as set forth in the separate declarations of attorneys Dan

---

[2] The choice by Plaintiffs' counsel to seek any below-market rates for purposes of this case only should not be construed as a waiver of their right to seek market rates in other matters.

Stormer and Charlie Wysong who practice in each of those markets, respectively.

### Peter Renn

54.     As summarized above, I have 15 years of legal experience, and I have specialized in LGBT rights litigation since 2010.  Attached as Exhibit A is a compilation of all the resumes of Plaintiffs' attorneys for whom fees are sought, including my own.

55.     I have sought hourly rates of $650 for 2020 and $675 for 2021.  These are justified by prevailing market rates for comparable legal work in Los Angeles, as set forth in the declaration of Dan Stormer.

56.     For work related to HB 509, I relied heavily upon two attorneys and a paralegal at Lambda Legal, described below, and we worked together closely as an internal team in order to perform the time-sensitive legal work demanded by the circumstances.  That includes during the period when lawmakers were considering adoption of HB 509.  That legislative work included explaining to lawmakers why adoption of the legislation would violate the injunction in this case, and while Plaintiffs have not sought fees for that work, it uniquely positioned the legal team to move forward quickly and efficiently once HB 509 was adopted.

### Kara Ingelhart

57.     Kara Ingelhart is a 2015 graduate of the Law School at the University of Chicago and is a Staff Attorney based out of Lambda Legal's Chicago office.  Ms. Ingelhart was awarded a Skadden Fellowship, a highly competitive national fellowship awarded to a small number of recent law school graduates entering public interest work, which allowed her to advocate on behalf of LGBT people immediately upon graduation.  She has spent her entire legal career focused on LGBT impact litigation.  Attached as part of Exhibit A is Ms. Ingelhart's resume.

58.     Ms. Ingelhart has significant experience representing transgender people seeking

birth certificates consistent with their gender identity and pursuing federal constitutional claims on their behalf.  This experience spans several jurisdictions, including Ohio, Kansas, and Puerto Rico, in addition to Idaho.  Ms. Ingelhart represented Plaintiffs in the 2017-18 litigation here, including arguing the summary judgment motion.

59.     Ms. Ingelhart has sought hourly rates of $320 for 2020 and $330 for 2021.  These are justified by prevailing market rates for comparable legal work in Chicago, as set forth in the declaration of Charlie Wysong.

### *Nora Huppert*

60.     Nora Huppert is a 2019 graduate of Columbia Law School.  She was based out of Lambda Legal's Los Angeles office from 2019 until September 1, 2021, at which point she transferred to Lambda Legal's Chicago office.  Ms. Huppert was awarded the Renberg Fellowship, which enabled her to work at Lambda Legal immediately upon graduation.  She is currently a Staff Attorney at Lambda Legal and has devoted her legal career to LGBT impact litigation.  Attached as part of Exhibit A is Ms. Huppert's resume.

61.     Ms. Huppert has experience litigating the constitutionality of government discrimination against transgender people, including in Alaska and West Virginia.  As noted above, Ms. Huppert also worked with Ms. Ingelhart and me on legislative work concerning HB 509 prior to its enactment.  She handled critical aspects of the litigation regarding HB 509, including arguing the second motion for clarification, which resulted in this Court's August 7, 2020 order confirming that enforcement of HB 509 violated the permanent injunction.

62.     Ms. Huppert has sought hourly rates of $325 for 2020 and $350 for 2021 (up through August 31st).  These are justified by the prevailing market rates for comparable legal work in Los Angeles, as set forth in the declaration of Dan Stormer.  She has sought a reduced

hourly rate of $270 for work performed after September 1, 2021, when she transferred to the Chicago office of Lambda Legal.  That is justified by prevailing market rates for comparable legal work in Chicago, as set forth in the declaration of Charlie Wysong.

### *Jamie Farnsworth (Paralegal)*

63.     Jamie Farnsworth is a paralegal at Lambda Legal based out of its Los Angeles office and has supported LGBT impact litigation at Lambda Legal for 14 years, including the original 2017-18 litigation here.  Among other tasks, Ms. Farnsworth collected, reviewed, and analyzed materials relating to the passage of HB 509, including testimony and statements made during legislative proceedings, although Plaintiffs have not sought fees for significant portions of the time spent on this work.

64.     Ms. Farnsworth seeks an hourly rate of $175 for work in 2020-21.  That is justified by prevailing market rates for comparable legal work in either Los Angeles or Boise, as set forth in the declarations of Dan Stormer and Thomas Lloyd, respectively.

### 2.     Cockerille Law Office

65.     Monica Cockerille is a 1996 graduate of the University of Wyoming School of Law.  Ms. Cockerille has legal experience with respect to changing Idaho birth certificates, and she also represented Plaintiffs in the 2017-18 litigation.  She was able to leverage that experience in the subsequent litigation concerning HB 509, and she further provided expertise with respect to local practice.  Partnering with Lambda Legal was necessary and appropriate in the litigation concerning HB 509, both in light of Lambda Legal's lead role in the original 2017-18 litigation, and the practical constraints of Ms. Cockerille's solo law practice.  Attached as part of Exhibit A is Ms. Cockerille's resume.

66.     Ms. Cockerille seeks an hourly rate of $410 for work in 2020-21.  That is justified

by prevailing market rates for comparable legal work in Boise, as set forth in the declaration of Thomas Lloyd.

### 3.      Covington & Burling

67.     Plaintiffs only seek fees for half of the Covington attorneys who represented them in the litigation concerning HB 509.  There were a total of six Covington attorneys:  Jean Veta, William Isasi, Henry Liu, Isaac Belfer, Michael Lanosa, and Colleen Smith.  Although they could reasonably do so, Plaintiffs have not sought fees for the time spent by Ms. Veta, Mr. Isasi, or Mr. Liu, who are the three most senior attorneys within that group, and who therefore have the highest hourly rates.  These senior attorneys reviewed and edited key briefs, assisted in litigation strategy, and participated in moots, among other tasks.  Attached as part of Exhibit A are the resumes for the three remaining attorneys for whom fees are sought:  Mr. Belfer (who departed Covington this year), Mr. Lanosa, and Ms. Smith (who, as noted above, began employment at Hawley Troxell Ennis & Hawley in March 2021).

68.     As to the three attorneys for whom fees are sought, Plaintiffs seek the following hourly rates.  For Mr. Belfer, who graduated from Harvard Law School in 2011, Plaintiffs seek $280 for 2020 and $290 for 2021.  For Mr. Lanosa, who graduated from the University of Southern California Gould School of Law in 2014, Plaintiffs seek $250 for 2020 and $260 for 2021.  For Ms. Smith, who graduated from William & Mary Law School in 2015, Plaintiffs seek $240 for 2020 and $250 for 2021.  These rates are justified by prevailing market rates for comparable legal work in Boise, as set forth in the declaration of Thomas Lloyd.  Mr. Lloyd's declaration also highlights the superior qualifications of each of these attorneys.

## IV.   Expenses

69.     Plaintiffs' counsel incurred a range of out-of-pocket costs as a result of the

litigation concerning HB 509, although they only seek to recover $750 in *pro hac vice* fees

incurred in 2020.  These fees would ordinarily be billed to a fee-paying client.

       Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

DATED: September 29, 2021             *Peter Renn*
                                       Peter C. Renn